UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DEBORAH DEANGELO,

                                        Plaintiff,                    **OPINION & ORDER**

        - against -                                                    No. 19-CV-7957 (CS)

MAXIMUS/NY MEDICAID CHOICE,

                                        Defendant.
-------------------------------------------------------------x

Appearances:

Deborah DeAngelo
Greenfield Park, New York
*Pro Se Plaintiff*

Kathryn J. Barry
Ryan C. Chapoteau
Jackson Lewis P.C.
Melville, New York
*Counsel for Defendant Maximus*

Seibel, J.

        Before the Court is the motion for summary judgement of Defendant MAXIMUS/NY

Medicaid Choice ("MAXIMUS").  (ECF No. 71.)[1]  For the following reasons, Defendant's

motion is GRANTED.

I.    **BACKGROUND**

        This case arises out of the alleged discrimination and retaliation that Plaintiff Deborah

DeAngelo claims to have experienced while employed by MAXIMUS.

---

        [1]According to Defendant, its correct name is MAXIMUS, Inc.  (ECF No. 73 ("D's
Mem.") at 1.)

A.    **Facts**

The following facts are based on Defendant's Local Civil Rule 56.1 Statement, (ECF No.

74 ("D's 56.1 Stmt.")), Plaintiff's Response to Defendant's Local Rule 56.1 Statement and

Further Statement of Material Facts in Opposition to the Defendant's Motion for Summary

Judgment, (ECF No. 81 ("P's 56.1 Stmt.")),[2] and the supporting materials, and are undisputed

except as noted.[3]

1.    **Plaintiff's Hiring and Initial Position**

On or around April 1, 2007, Defendant MAXIMUS hired Plaintiff Deborah DeAngelo as

a field service customer representative, also referred to as a "Client Service Representative –

Outreach" ("CSRO").  (P's 56.1 Stmt. ¶¶ 16-17.)  Defendant is a government services contractor

that partners with state, federal, and local governments to provide health and human services

programs to a variety of communities.  (*Id*. ¶ 9.)  Defendant contracts with the New York

Department of Health ("NYSDOH") to provide outreach, education, and enrollment services for

---

[2] Plaintiff's 56.1 Stmt. responds to Defendant's 56.1 Stmt. and then concludes by stating that "[a]dditional material facts, for which there is support in the record, are included in plaintiff's attached declaration."  (P's 56.1 Stmt. at 29.)  To the extent Plaintiff intended her declaration, (ECF No. 83 ("P's Decl.")), to be incorporated into her 56.1 Statement and constitute the counterstatement authorized by Local Rule 56.1, it is improper.  The declaration consists of facts that Plaintiff regards as helpful and undisputed, but Local Rule 56.1 permits only a counterstatement of "additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute."  *Ostreicher v. Chase Bank USA, N.A.*, 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020).  I have nevertheless considered Plaintiff's submission.

[3] In numerous instances, Plaintiff purports to "partially dispute[]" a statement set forth by Defendant, but her explanation of the "partial[] dispute" reveals that she does not in fact dispute Defendant's statement, but rather wants to provide additional facts or context.  (*See, e.g.*, P's 56.1 Stmt. ¶¶ 62, 66, 120, 126.)  In those instances, I regard Defendant's statement as undisputed and consider Plaintiff's additional information if relevant.

NYSDOH's managed care enrollment program, New York Medicaid Choice ("NYMC").  (*Id.* ¶¶ 9-10.)

The outreach and enrollment services that Plaintiff provided as a CSRO included "education on managed care options and public health programs; assisting individuals with enrollment and disenrollment processes; reviewing enrollment forms for accuracy and completeness; and completing various data entry tasks."  (*Id.* ¶¶ 18-19.)  The job required computer literacy and proficiency in Microsoft Office, including Excel and Word.  (*Id.*)  Defendant estimates that Plaintiff's role required her to use a computer keyboard "constantly" – approximately 67%-100% of the workday, (*id.* ¶ 20) – but Plaintiff testified that in 2015, 2016, and 2017, she typed for only 30-35% of her day, at least absent special projects, although the percentage was higher in 2014, (ECF Nos. 72-3, 72-4 ("P's Depo.") at 97:8-98:20).  On her application for Social Security Disability Insurance ("SSDI") benefits dated September 13, 2018, Plaintiff stated, "I did a lot of typing for my job."  (ECF No. 72-10 at 7.)[4]

During the time of Plaintiff's employment, pursuant to Defendant's contract with the NYSDOH, CSROs were assigned to provide enrollment services at local government offices throughout New York, not from a MAXIMUS office, and were required to be present full-time.  (P's 56.1 Stmt. ¶¶ 23-24.)  Defendant did not have any part-time CSROs.  (*Id.* ¶ 30.)  From April 2007 until November 2016, Plaintiff worked at the Sullivan County Department of Social Services and was the only CSRO and only MAXIMUS employee in the building.  (*Id.* ¶ 26.)

---

[4] Citations to ECF No. 72-10, as well as ECF Nos. 72-5, 72-14, 72-21, 72-22, 72-25, and 83-1 refer to the page numbers generated by the Court's electronic filing system.

    **2.**      **Plaintiff's Alleged Disability and Subsequent Requests for Accommodation**

       a.    <u>2015</u>

On January 15, 2015, Plaintiff reported that she sustained an injury to her right elbow as a result of a Sullivan County employee opening a steel bathroom door on her arm. (*Id.* ¶ 27.) On or about March 9, 2015, Plaintiff submitted a doctor's note dated February 25, 2015 that read, "[L]imit repetitive stress to upper extremity to no more than 2 hours per day. No lifting over 5 pounds. Suggest supervisory or advisory work." (ECF No. 72-11; P's 56.1 Stmt. ¶ 28.) Defendant permitted Plaintiff to work a two-hour-per-day reduced schedule from approximately March 17 to March 19, 2015, (P's 56.1 Stmt. ¶ 29), but then determined that Plaintiff could not continue to work part-time and would have to go on a leave of absence starting March 20, 2015, because Defendant was required to have a full-time CSRO at Sullivan County during regular business hours and did not employ part-time CSROs, and because Plaintiff's doctor said she could not work full-time, (*id.* ¶¶ 30-32). Plaintiff thereafter "asked about using the computer cart from [Sullivan County's] lobby and mentioned that [she] had purchased a mouse cushion," but according to Plaintiff, Lydia Cortez, MAXIMUS's Manager – Outreach OM, (*id.* ¶ 12), and Jennifer Herrera, MAXIMUS's Manager of Human Capital, (*id.* ¶ 13), told Plaintiff that she could not return to work unless she had no restrictions, (P's Depo. at 111:24-112:10). As of March 2015, no doctor had told P that she could perform the essential functions of her position on a full-time basis if she used a computer cart. (*Id.* at 112:24-113:24.)[5]

On or about July 31, 2015, while Plaintiff was still on leave, she requested (apparently at the suggestion of Dr. Sohda) that Defendant conduct an ergonomic assessment of Plaintiff's

---

[5] Plaintiff testified that Dr. Samir Sohda told her on July 31, 2015 that she would be able to perform her job on a full-time basis if she used the cart. (P's Depo. at 113:4-17.)

workstation.  (P's 56.1 Stmt. ¶ 35; ECF No. 72-13.)  Defendant retained Travelers to do so, and

on August 17, 2015, Travelers recommended that Defendant install an ergonomic keyboard tray

at Plaintiff's workstation and provide Plaintiff with an ergonomic mouse, which Defendant did.

(P's 56.1 Stmt. ¶ 36; *see* ECF Nos. 72-1, 72-2 ("Herrera Decl.") Ex. A-3.)  On or around August

4, 2015, Plaintiff notified Defendant that she was cleared to return to work, and she returned on

or about August 17, 2015.  (P's 56.1 Stmt. ¶ 37.)

b.   <u>2016</u>

On or about June 7, 2016, Plaintiff took a leave of absence for elbow surgery.  (*Id.* ¶ 38.)

About three weeks thereafter, on June 29, 2016, Plaintiff submitted a note from her doctor that

stated that she was "unable to use [her] right upper extremity in any work capacity" and therefore

could not perform "repetitive type manners" using that arm.  (Herrera Decl. Ex. A-5; P's 56.1

Stmt. ¶ 39.)  Defendant granted Plaintiff a leave of absence until or around September 12, 2016,

when she was cleared to return to work.  (P's 56.1 Stmt. ¶ 40.)  Once she returned, Plaintiff

occupied the same role, with the same terms, conditions, and accommodations.  (*Id.* ¶ 41.)

On September 27, 2016, Plaintiff reported that again she was struck on her right

forearm/elbow by the bathroom door at the Sullivan County office.  (*Id.* ¶ 42; ECF No. 72-14 at

3.)  Around October 3, Plaintiff submitted a note from her doctor that said she could only return

to "[l]ight duty work with no significant use of right upper extremity.  If unavailable, then out of

work until further notice."  (P's 56.1 Stmt. ¶ 43; Herrera Decl. Ex. A-6.)  According to

Defendant, there was no "light duty work" where Plaintiff would have "no significant use of

[her] right upper extremity," so Defendant provided Plaintiff with a leave of absence starting

October 3, 2016.  (P's 56.1 Stmt. ¶¶ 45-46.)  Plaintiff disputes when the leave of absence began,

5

stating that Defendant required her to leave the Sullivan County office on September 29, 2016 in order to get medical care.  (P's 56.1 Stmt. ¶ 46.)[6]

On October 20, 2016, Herrera – who by then was the Senior Manager of Human Capital at MAXIMUS, (P's 56.1 Stmt. ¶ 13) – emailed Plaintiff informing her that Defendant was "working with Traveler's [*sic*] and [her] medical provider to explore if there's a way to bring [her] back to work with an accommodation or adjusted restrictions," (ECF No. 72-15).  She also asked Plaintiff to let her know if she had "any suggestions for how [Defendant could] support [her] return to work while still adhering to [her] doctor's restrictions."  (*Id.*)  Plaintiff gave Defendant a note from her doctor, dated October 24. 2016, that stated, "Patient may return to work, full duty, as of November 14, 2016[, and is] [t]o remain on light duty status until then." (ECF No. 72-16.)  On October 31, 2016, Plaintiff met with Herrera and informed her that Defendant did not have authorization to contact her doctor.  (P's 56.1 Stmt. ¶ 48; *see* ECF No. 83-1 at 33.)  On November 14, 2016, Plaintiff returned to work.  (P's 56.1 Stmt. ¶ 49.)

While Plaintiff was on leave of absence, Sullivan County informed Defendant that the County would no longer allow Defendant's employees to work in the Sullivan County office. (*Id.* ¶ 50.)  Defendant so notified Plaintiff in October 2016 and offered to reassign Plaintiff to work as a CSRO for Orange County in either Middletown or Goshen.  (*Id.* ¶ 52.)  Plaintiff chose Middletown, but before returning to work on November 14, Plaintiff asked Cortez if she could instead be reassigned to Ulster County, which Cortez said she would "think about."  (*Id.* ¶¶ 52-53.)

On November 14, 2016, Plaintiff reported to the Middletown office and found that the keyboard tray that had been installed at her workstation at the Sullivan County office was not

---

[6] This dispute is immaterial.

installed at her workstation in Middletown, but she understood that Defendant did not own the equipment at the Middletown office. (*Id.* ¶¶ 54-55.) Plaintiff also had concerns about the office's location on the top floor. (*Id.* ¶ 56.) On November 21, 2016, Defendant transferred Plaintiff to the Ulster County office, as she had requested, (*id.* ¶ 53), and installed her keyboard tray at her new workstation, (*id.* ¶ 57.) Although Defendant provided Plaintiff with an ergonomic chair in Ulster County, Plaintiff requested that Defendant deliver the chair that she had used at the Sullivan County office, which Defendant did, after which Plaintiff had no concerns with her new workstation. (*Id.* ¶¶ 58-60.)

Unlike Sullivan County, Ulster County had multiple CSROs assigned to its office, and they were sometimes required to cover other counties if the lone CSR for that county was out. (*Id.* ¶¶ 61-63.) Upon learning that she could be required to provide site coverage to the Departments of Social Services in Albany, Columbia, and Greene counties, Plaintiff emailed Cortez on November 29, 2016, "requesting an opportunity to meet with [her] to discuss [her] expectations for [Plaintiff] to cover other sites should they not meet [her] ergonomic requirements." (*Id.* ¶¶ 64-66; ECF No. 72-17.) She met with Cortez and Herrera on December 2, 2016, and they agreed that Plaintiff would shadow each of the sites at which she might have to provide coverage to in order to "find out how they work their site" and identify any issues with the site. (P's 56.1 Stmt. ¶ 67.) It was further agreed that Plaintiff would not be assigned site coverage until after she shadowed each site and discussed the results with Herrera. (*Id.* ¶ 68.)

c.     2017

Around January 24, 2017, Herrera provided Plaintiff with a note for Plaintiff's medical provider, in which Herrera explained that Defendant could not install a keyboard tray or a Tempur-Pedic chair at every site that Plaintiff may cover and asked for "suggestions on possible alternatives, such as footrests and back supports," along with "[a]ny additional guidance or

accommodation suggestions." (*Id.* ¶ 70; ECF No. 72-19.) Plaintiff does not remember whether she provided this note to her medical provider. (P's 56.1 Stmt. ¶ 71.)

Between December 2016 and March or April 2017, Plaintiff shadowed individuals at the Albany, Columbia, and Greene offices. (*Id.* ¶ 69.) She was not required to use a computer while shadowing. (*Id.* ¶ 67.) Thereafter Plaintiff spoke to Cortez and Herrera to discuss the setup at each office and any issues Plaintiff may have with them. (*Id.* ¶ 69.) As it turned out, Plaintiff was never required to provide site coverage. (*Id.* ¶ 72.)

Around May 24, 2017, Plaintiff submitted a note from her physician that stated, "No repetitive stress to right upper extremity. NO lifting. Suggest supervisory or advisory until reassessed at next appointment on 6/28/17." (*Id.* ¶ 73; Herrera Decl. Ex. A-8.) Later that day, Plaintiff spoke with Cortez and Herrera over the phone and Herrera suggested Plaintiff consider using a left-handed keyboard so she could continue working. (P's 56.1 Stmt. ¶¶ 74-75.) According to Plaintiff, Herrera "was enthusiastic about researching the potential of [Plaintiff] staying on with this keyboard, and that it could be ordered within 24 hours." (*Id.* ¶ 74; P's Depo. at 174:14-175:4.) Herrera requested that Plaintiff submit a note from her medical provider stating that Plaintiff could return to work if she used a left-handed keyboard. (P's 56.1 Stmt. ¶ 76.) In the meantime, based on the May 24, 2017 doctor's note, Defendant granted Plaintiff a leave of absence, effective that day. (*Id.* ¶ 77.)

On June 8, 2017, Plaintiff submitted another doctor's note, which stated, "Please allow Deborah Deangelo to use a left handed keyboard at her request in order to not inflict anymore damage to her previous injury. She is scheduled for surgery on July 18, 2017." (*Id.* ¶ 78; ECF No. 72-20.) On June 14, 2017, Herrera and Plaintiff discussed which type of left-handed keyboard Plaintiff would prefer, (P's 56.1 Stmt. ¶ 79), and a left-handed keyboard was in place

by the time Plaintiff returned to work on July 6 or 7, 2017, (*id.* ¶ 80; P's Depo. at 180:5-10).

Plaintiff then requested a different left-handed keyboard because she was having difficulties

using the one that Defendant had obtained, (*id.* ¶ 81), and Defendant provided the new one on or

about July 26, 2017, (*id.* ¶ 82).

Around August 15, 2017, Defendant granted Plaintiff another leave of absence for a

second surgery on her elbow.  (*Id.* ¶ 83.)  Plaintiff then submitted a doctor's note dated October

23, 2017, that stated Plaintiff should remain out of work until "re-eval" on November 27, 2017.

(*Id.* ¶ 84; Herrera Decl. Ex. A-9.)[7]  Plaintiff then submitted another doctor's note, dated

November 27, 2017, that stated Plaintiff should remain out of work until further notice.  (P's

56.1 Stmt. ¶ 85; Herrera Decl. Ex. A-10.)  Defendant then continued Plaintiff's leave of absence.

(P's 56.1 Stmt. ¶ 86.)

d.    2018

Around January 24, 2018, Plaintiff submitted a doctor's note that stated that Plaintiff

could return to work without physical restrictions but only for 17.5 hours per week.  (*Id.* ¶ 87;

Herrera Decl. Ex. A-11.)  On January 29, Herrera connected with Plaintiff to discuss her doctor's

note and potential accommodations.  (P's 56.1 Stmt. ¶ 88.)  Plaintiff told Herrera that she could

work up to 20 hours a week, and the two discussed the option of Plaintiff working in the CSR –

Call Center ("CSRCC") position.  (*Id.* ¶¶ 88, 90.)  This position required answering calls from

the public, prospective Medicaid enrollees, and individuals assisting enrollees; tracking and

documenting inquires; facilitating requests for materials; transferring or referring calls to

---

[7] Defendant's 56.1 Statement states that the October 23, 2017 doctor's note stated "Plaintiff was to remain out of work until November 17, 2017," (D's 56.1 Stmt. ¶ 84), but the note itself states "[Plaintiff] is to remain out of work until November 27, 2017," (Herrera Decl. Ex. A-9).

appropriate entities; and escalating calls as necessary.  (P's 56.1 Stmt. ¶ 91.)  The position

required typing but also allowed for part-time work and work from home.  (*Id.* ¶¶ 90-91.)

Around February 5, 2018, Herrera sent Plaintiff a letter, dated February 4, which stated:

In response to your request for a part-time schedule, the Outreach Department
does not have part-time positions, and we are not able to create a part-time
position in the department.  As an alternative, we briefly discussed the possibility
of working from home as a telecommuter for the NYMC Call Center in a CSR -
Call Center position . . . If you would like to discuss this possibility, I would be
happy to provide more information.

(*Id.* ¶ 92.)  At that time, Defendant required all employees who worked remotely to enter into a

telecommuter agreement, so Herrera sent Plaintiff a copy of this agreement on February 5.  (*Id.*

¶¶ 93-94.)  On February 6, Plaintiff provided a new note that stated she could return to work 20

hours per week, but – like the previous note – the note did not specify how long Plaintiff would

need to work part-time.  (*Id.* ¶¶ 88-89; Herrera Decl. Ex. A-12.)

Around February 16, 2018, Plaintiff had a conversation with Herrera and John Ramirez,

the Manager for the NYMC's Call Center, (Herrera Decl. ¶ 52), in which they discussed the part-

time CSRCC position and Ramirez explained to Plaintiff that she would be required to attend an

in-person training in New York City before she could begin working in that capacity.  (P's 56.1

Stmt. ¶ 95.)  Plaintiff testified that they also discussed "the initial training that could be . . . two

to three months, and then [they] discussed [Plaintiff's] experience, and then [Ramirez] said

maybe two to three weeks."  (P's Depo. at 209:6-13.)  Defendant required all CSRCCs to attend

this in-person training before starting work and the trainings were scheduled in group sessions

that began once a month.  (P's 56.1 Stmt. ¶¶ 97-98.)  Plaintiff "gave [Herrera] a verbal

commitment that [she] . . . wanted to accept the [CSRCC] position."  (P's Depo. at 220:5-12; P's

56.1 Stmt. ¶ 99.)  She also told Herrera that she "needed to secure funds" for the training –

presumably for the commuting costs – but claims she expected to begin her training on March 12, 2018. (P's 56.1 Stmt. ¶ 100; P's Depo at 226:2-17.)

On April 13, 2018, Plaintiff sent Herrera an email, in which she said, "I would like to move forward and am presently working on securing finances for the training." (Herrera Decl. Ex. A-13.) According to Defendant, before Herrera received this email from Plaintiff, she did not believe that Plaintiff had made a final decision about whether she was accepting the CSRCC position. (P's 56.1 Stmt. ¶102.) Plaintiff disputes this, stating that text messages between Plaintiff and Herrera from January 24, 2018 to April 13, 2018 show Plaintiff's efforts to commit. (*Id.*) In response to Plaintiff's April 13 email, Herrera responded, "That's great news! I'm glad to hear that. I'll draft a transfer letter which should be ready by Thursday, COB. I'll also put you in touch with John Ramirez again to discuss timelines." (Herrera Decl. Ex. A-13.)

According to Defendant, sometime between February 15 and April 23, 2018, Plaintiff asked Herrera whether Defendant could provide her with an ergonomic workstation to use at home. (P's 56.1 Stmt. ¶ 106.) Plaintiff states that during a February 28 call with Herrera, Plaintiff asked if the equipment she was using at the Ulster site could be provided to her at home and that on March 16, Herrera texted that Defendant could provide her with the chair, keyboard, and keyboard tray to use at home. (*Id.*) Plaintiff also asked Herrera if Defendant could provide her with voice-recognition software for her home computer and if Defendant could reimburse her for travel expenses or provide a hotel to stay overnight for the training in New York City. (*Id.* ¶ 107.)

On April 23, 2018, Herrera wrote Plaintiff a letter "to confirm your transition from the Outreach Department to the Call Center Department as a Telecommuting CSR 1 – Call Center. The transition will be effective after a successful home inspection is completed. This will be a

permanent transition." (ECF No. 72-21 at 2.)  In the letter, Herrera also stated that Defendant would provide Plaintiff with an ergonomic chair, a keyboard tray, and a left-handed keyboard but Defendant would not reimburse her for travel expenses.  (*Id.*)  Regarding Plaintiff's request for voice-recognition software, Herrera wrote that while the software would be available on her computer, it could only be used for offline activities, which only take up a small amount of the workday.  (*Id.*)  The next day, Plaintiff emailed Herrera saying "[I] [j]ust wanted to follow up with you regarding the training for the telecommuter program.  I was able to secure funds for my commute to training and they should be available to me within the next two weeks." (Herrera Decl. Ex. A-13.)

Defendant required a "home inspection" before any remote employee could start working from home.  (P's 56.1 Stmt. ¶ 110.)  Plaintiff's home inspection took place on May 3, 2018, when Plaintiff also signed the telecommuter agreement.  (*Id.* ¶ 111.)  On May 10, Plaintiff emailed Herrera asking a variety of questions based on the telecommuter agreement, including about the "telecommuters requirement to report to 30 broad street, if system not available." (ECF No. 72-22 at 9; Ps' 56.1 Stmt. ¶ 112.)  Plaintiff asked, "Would I be required to do so, if yes is there reimbursement for expenses?  If not, would I be paid for time or required to use pto." (ECF No. 72-22 at 9; Ps' 56.1 Stmt. ¶ 112.)[8]  Plaintiff also asked about a security program that had to be installed on her cell phone; she wanted to know if Defendant "will provide cell phone reimbursement." (ECF No. 72-22 at 9; Ps' 56.1 Stmt. ¶ 112.)[9]  Herrera responded to Plaintiff's requests by email.  (ECF No. 72-22 at 6-8.)  In a May 14, 2018 email Plaintiff was informed,

---

[8] The Court presumes that "pto" stands for "paid time off."

[9] This program seems to be a two-factor authentication program that generates a "key" or "token" needed to access some of MAXIMUS's online systems.  (*See* ECF No. 72-22 at 8-9.)

among other things, that although the agreement stated that telecommuters would have to report to New York City if the system was not available, in the event of system unavailability Plaintiff could choose between reporting to the city or taking time off ("PTO" or "LWOP"),[10] in light of the distance from her home to the city.  (*Id.* at 8.)  She also advised Plaintiff that MAXIMUS did not reimburse for cellphones.  (*Id.*)  On the same date Plaintiff also expressed concerns about spotty cellphone service at her residence, and Herrera assured her that the systems manager had confirmed that the phone-based security system would work even with spotty service, and noted that she (Herrera) had never had problems despite a weak cell signal at her home.  (*Id.* at 6-7.)

Plaintiff was scheduled to return to work and begin training for her new part-time telecommuter position on May 15, 2018.  (P's 56.1 Stmt. ¶ 118.)  But on May 14, 2018, at 5:21 p.m., Plaintiff emailed Herrera and said, "I am requesting to postpone tomorrows [*sic*] training."  (ECF No. 72-22 at 6.)  Herrera responded by asking why Plaintiff was no longer going to come to the training, (*id.* at 5), to which Plaintiff replied, "As per my previous email, I requested to put the training on hold.  I will be reaching out to Mr. Cohen," (*id.*).[11]  Plaintiff testified that she did not attend the training "because of concerns [she] had about the telecommuter agreement," and when asked whether the concerns she had about the telecommuter agreement were related to her physical health, Plaintiff responded, "One item, not specifically, but the other one, possibly."  (P's Depo. at 230:4-14.)  She testified that the "other one" was whether she would have to travel to the city if the system went down, and that she did not, at the

_____

[10] The Court presumes that "LWOP" stands for "leave without pay."

[11] Plaintiff has not explained what "Mr. Cohen" had to do with her training, but she states that he was "the person listed on my workers compensation correspondence, I thought I could speak with him for guidance.  He advised he was a point of contact."  (P's 56.1 Stmt. ¶ 120.)

time she postponed the training, recall having been informed (earlier that day) that time off, rather than going to the city, was an option.  (*Id.* at 230:15-25.)

On May 15, Herrera again asked Plaintiff why she put off the training, and in response the next day, Plaintiff inquired about (among other things) the status of the promised workstation accommodations, mentioned again her concern about spotty cell service, and asked if there were alternatives to PTO or going to the city if her system was not working.  (ECF No. 72-22 at 3-4.) Herrera responded, advising (among other things) that the equipment would be delivered before Plaintiff started working from home, that the spotty cell service was not an issue, and that she could not think of alternatives if the system went down but invited Plaintiff to share her thoughts on that subject.  (*Id.* at 2-4.)  She also noted that the window for the May training had closed so they would need to find out when the next training would be.  (*Id.* at 2.)  Plaintiff responded the next day, again raising the spotty service and also asking if she could receive the training module, if insurance would cover the value of her equipment in the event of a loss, and when the next training would be.  (*Id.*)  She also said she would email a doctor's note that confirmed she could work full days for the training.  (*Id.*)

Around June 7, Herrera told Plaintiff she could begin training later that month and in response, Plaintiff asked about the new position's training requirement, cell phone service requirements, and when she would need to report service interruptions to the call center.  (P's 56.1 Stmt. ¶ 124.)  Plaintiff was rescheduled to begin training on June 25, 2018.  (*Id.* ¶ 126.)  On June 21, Herrera sent Plaintiff a letter confirming that Plaintiff was scheduled for training on June 25, 2018, that the security program did not require a cell phone connection, and that in the unlikely event that she experienced a systems outage lasting longer than a day, she would have to report in person or take time off.  (ECF No. 72-23.)  On June 21, Herrera asked Plaintiff to

confirm by 4 p.m. the next day that she would start training on June 24.  (Herrera Decl. Ex. A-16.)  Plaintiff responded the next day that she was "unable" to meet that deadline and that she would "f[ol]low up with [Herrera] next week."  (*Id.* at 21.)  According to Plaintiff, she did not report to training as scheduled because the June 21 letter "didn't necessarily translate to the timeline.  And [she] also received a notification from the Workers' Compensation Board that said [she] had – that Maximus had advised them that [she] did not – that I wanted like more time to be out, something to that effect."  (P's Depo. at 232:8-234:19.)  She "wasn't understanding what was happening."  (*Id.* at 249:19-25.)

On July 26, 2018, Herrera sent Plaintiff a letter stating that she was expected to report for training on August 6 and if she failed to do so, "it will be assumed that [she has] voluntarily resigned from [her] position."  (ECF No. 72-24; P's 56.1 Stmt. ¶ 131.)  Plaintiff understood that this was her third and final opportunity to do the training.  (P's 56.1 Stmt. ¶ 132.)  On August 1, Plaintiff responded stating "I have an appointment scheduled for August 22, 2018 that I have been trying to get scheduled sooner and was put on a waiting list.  In light of my upcoming appointment, [I] am unsure and at the interest of all parties, to move fo[r]ward with the August 6th training date."  (ECF No. 72-26.)  Plaintiff did not state what kind of appointment it was.  (*Id.*; P's 56.1 Stmt. ¶ 134.)[12]  Plaintiff had been told that the training would take at least two weeks, (Herrera Decl. Ex. A-15, 72-25 at 2; P's 56.1 Stmt. ¶ 135), depending on her progress, (ECF No. 72-22 at 3).  When asked why an appointment on August 22, 2018 would impact her ability to attend the August 6 training, Plaintiff said, "To me, it was all this time had passed and I didn't know how this doctor was going to respond to the issues I was having.  So I thought,

---

[12] The appointment, as it turned out, was at the Hospital for Special Surgery in Manhattan, (ECF No. 72-29) where the training was to take place.

respectfully, instead of having people start to train me and then have a doctor's appointment, I thought – and, again, I didn't know what the timeline was.  There was no schedule provided.  It was just the start date.  I thought it was best to just wait until after the appointment."  (P's Depo. at 255:12-25.)

On August 7, Herrera sent Plaintiff a letter stating that because it did not appear that Plaintiff was willing to resume work, MAXIMUS was assuming that she was voluntarily resigning from her position, but that Plaintiff should contact a colleague of Herrera's by August 15 if that was not accurate.  (ECF No. 72-27.)  On August 13, Plaintiff emailed the colleague stating, "[M]y decision not to attend the training was due to my appointment scheduled for 8/22/18 [and] [t]his decision was in consideration of Maximus and not intended to appear as unwilling to resume duty or to voluntarily resign from my position."  (ECF No. 72-28 at 3.)  On August 22, Plaintiff submitted a doctor's note that stated Plaintiff "is to remain out of work for next 6 weeks."  (ECF No. 72-29.)

On September 18, 2018, Defendant notified Plaintiff by letter that it would be terminating her employment effective immediately, noting that Plaintiff had provided a doctor's update on August 22 stating that Plaintiff was to stay out of work for an additional six weeks, but explaining that "[a]t this point, we cannot continue to extend your leave further."  (P's 56.1 Stmt. ¶ 141.)  According to Awilda Martinez, MAXIMUS's Vice President of U.S. Health and Human Services, she concluded that there was no accommodation that they could offer Plaintiff that would allow her to return to work, given that Plaintiff had already passed up three opportunities to train for the CSRCC position.  (*Id.* ¶ 140.)

On September 13, 2018 Plaintiff filed an application for SSDI benefits.  (*Id.* ¶ 142; *see* ECF No. 72-10.)  On her application, Plaintiff wrote that she stopped working on July 15, 2017

"[b]ecause of [her] condition," and that her end date at Defendant was August 2017.  (ECF No.

72-10 at 6-7.)  She also wrote

> I did a lot of typing for my job.  I cannot type without doing myself harm.  I am in
> constant pain.  The headaches and neck injury, [sic] are bad enough to make me
> vomit at times.  Sitting is becoming increasingly hard to do for any length on
> time.  plantar facetious [sic].  [H]urt all the time.  It hurts to walk and it is now
> interfering with the nerves in my feet.

(Id. at 7.)  On January 9, 2020, after a hearing at which Plaintiff testified, U.S. Administrative

Law Judge ("ALJ") Brian W. Lemoine determined that Plaintiff "has been under a disability as

defined in the Social Security Act since August 14, 2017, the alleged onset date of the

disability," and awarded her SSDI benefits.  (ECF No. 72-30 at 7; P's 56.1 Stmt. ¶ 144.)  The

ALJ's decision stated, "She indicated that this pain prevented her from handling and holding

items such as a coffee cup, typing, or handling small objects, or fastening clothing or shoes with

her right dominant hand."  (ECF No. 72-30 at 2.)  He also found that she is "unable to perform

any past relevant work" and that "[t]he demands of [her] past relevant work exceed the residual

functional capacity."  (Id. at 7.)

Plaintiff had not requested any other accommodations to her workstation besides the

ergonomic equipment, and had she actually started working from home, Defendant would have

provided her with the ergonomic equipment that she had had at the Ulster County office.  (P's

56.1 Stmt. ¶ 146.)  Plaintiff notes that a date for delivery of that equipment was never set.  (Id.)

When asked if there was anything that Defendant could have offered that would have allowed

her to work, Plaintiff said, "I believe, if anything, I would have liked the opportunity to try to

possibly resume to my prior position, with all the ergonomic work equipment that had previously

been provided to me."  (P's Depo. at 273:5-12.)  She testified that she believed that her previous

position as a CSRO was less physically demanding that the CSRCC position but she "didn't

really know."  (Id. at 274:13-275:2.)  When asked how a "part-time client service representative

position" would have addressed the issues she had listed in her SSDI application, she said "I'm not sure." (*Id.* at 275:21-25.) Plaintiff also testified that "[b]ased on the doctor's note," as of September 18, 2018, she could not perform the role of a part-time call center representative. (*Id.* at 337:17-21.) And as of October 3, 2018, Plaintiff testified that she was not cleared to physically perform the part-time call center representative role. (*Id.* at 337:22-338:2.) When asked, as of September 18, 2018 and as of October 3, 2018, "what, if any, accommodation could Maximus have given you that would have allowed you to return to the part-time call center representative role?" Plaintiff said, "I don't know." (*Id.* at 364:3-17.) She further testified that she had not been cleared to work full-time in any position. (*Id.* at 365:13-16.)

During the course her employment with MAXIMUS, Plaintiff filed several workers' compensation claims, including in December 2011, March 2012, January 2015, and September 2016, and believes Defendant retaliated against her because of them and because she reported an incident involving the Sullivan County Commissioner of Social Services. (P's 56.1 Stmt. ¶¶ 164-167.)

Plaintiff initially reached out to the U.S. Equal Employment Opportunity Commission ("EEOC") in June 2018 after receiving a notice from the workers compensation board that stated that she had not attended a training. (P's 56.1 Stmt. ¶ 1.) Plaintiff testified that she contacted the EEOC because she was "struggling with the fact that [she] didn't understand why things were evolving the way they were." (P's Depo. at 331:20-332:1.) On or about March 4, 2019, Defendant received a notice, dated February 28, 2019, that Plaintiff had filed a Charge of Discrimination dated December 10, 2018. (P's 56.1 Stmt. ¶ 1; ECF No. 72-5.) In the charge, Plaintiff alleged that Defendant had unlawfully discriminated against her on the basis of disability – an injury to her right arm; failed to reasonably accommodate her; subjected her to a

hostile work environment; and retaliated against her for engaging in protected activity.  (ECF No. 72-5 at 4.)  On or about May 24, 2019, the EEOC issued a Dismissal and Notice of Right to Sue.  (ECF No. 72-6.)

      **B.**    **Procedural History**

Plaintiff brought this suit, *pro se*, on August 22, 2019, against Defendants MAXIMUS and Sullivan County Department of Social Services, asserting claims of wrongful termination, failure to accommodate, retaliation, and hostile work environment under the Americans with Disabilities Act of 1990 ("ADA"), the Rehabilitation Act of 1973 ("RA"), and New York State Human Rights Law ("NYSHRL").  (ECF No. 2 ("Compl.") at 4-5.)  The case was ordered to mediation on October 31, 2019.  (ECF No. 8.)  On January 10, 2020, Defendant Sullivan County submitted a pre-motion letter in anticipation of its motion to dismiss, (ECF No. 14), and on February 7, 2020, I held a pre-motion conference, where I granted Plaintiff leave to amend her complaint, (Minute Entry dated Feb. 7, 2020).  Plaintiff did not file an amended complaint. MAXIMUS answered, (ECF No. 23), and Sullivan County filed its motion to dismiss, (ECF No. 28).  On December 4, 2020, I issued a bench ruling granting Sullivan County's motion. Plaintiff's discrimination claim against Sullivan County was dismissed with prejudice and her personal injury claims, to the extent any were intended, were dismissed without prejudice. (Minute Entry dated Dec. 4, 2020.)

After discovery, Defendant submitted a pre-motion letter in anticipation of its motion for summary judgment.  (ECF No. 68.)  On January 5, 2022, the Court held a pre-motion conference, (Minute Entry dated Jan. 5, 2022), and the instant motion followed.  (ECF Nos. 71-74, 81-84.)

II.     **LEGAL STANDARD**

    A.      **Motion for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

**B.     *Pro Se* Plaintiffs**

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (cleaned up), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020).  *Pro se* status "does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than 'bald assertions, completely unsupported by evidence' to overcome the motion." *Keesh v. Quick*, No. 19-CV-

8942, 2022 WL 2160127, at *4 (S.D.N.Y. June 15, 2022) (quoting *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020)).[13]

## III.   DISCUSSION

Plaintiff alleges discrimination based on disability, failure to accommodate, retaliation, and hostile work environment, in violation of the ADA, the RA, and the New York State Human Rights Law ("NYSHRL").  (*See* Compl. at 4-5; P's 56.1 Stmt. ¶ 153.)  Defendant argues that it is entitled to summary judgment on all claims.

### A.   Time Bar

Defendant argues that the majority of Plaintiff's claims are time barred under the ADA, RA, and NYSHRL.  (D's Mem. at 3-4.)

#### 1.   ADA Claims

Under the ADA, a plaintiff has 300 days from the date of the alleged unlawful action to file a complaint with the EEOC.  *See* 42 U.S.C. § 2000e-5(e)(1); *Harris v. City of N.Y.*, 186 F.3d 243, 247-48, 248 n.2 (2d Cir. 1999).  "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the

_____

[13] In her papers, Plaintiff notes, "Portions of this document may have been prepared with assistance from NYLAG's Legal Clinic for Pro Se Litigants in the SDNY."  (ECF No. 82 ("P's Opp.") at 1 n.1; P's 56.1 Stmt. at 1 n.1.)  The wording "may have" is meaningless, because Plaintiff either prepared her papers with help from the New York Legal Assistance Group or she did not.  Use of that locution seems intended to be a semantic dodge.  Some courts have limited or withdrawn special solicitude where a *pro se* plaintiff has received help from NYLAG.  *See, e.g.*, *Bizelia v. Clinton Towers Hous. Co.*, No. 20-CV-8065, 2022 WL 1747763, at *3 (S.D.N.Y. May 31, 2022); *Littlejohn v. Consol. Edison Co. of New York, Inc.*, No. 18-CV-6336, 2019 WL 3219454, at *1 n.1 (S.D.N.Y. July 17, 2019).  "The Court remains cognizant, however, that if *pro se* litigants who receive limited assistance from NYLAG lose all protections afforded to them, NYLAG faces a catch-22:  providing less than full representation will harm litigants by eliminating the special care otherwise afforded."  *Karupaiyan v. CVS Health Corp.*, No. 19-CV-8814, 2021 WL 4341132, at *6 (S.D.N.Y. Sept. 23, 2021) (cleaned up).  I "need not resolve this conflict at this time," as Plaintiff's opposition to the motion is insufficient to avoid summary judgment "even when read with special solicitude."  *Id.* (cleaned up).

employer's discriminatory conduct." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir. 2000); *see Alleyne v. Am. Airlines, Inc.*, 548 F.3d 219, 222 (2d Cir. 2008).  The EEOC received Plaintiff's complaint on December 17, 2018.  (ECF No. 72-5 at 4.)  Thus, any ADA claims arising prior to February 20, 2018 are time-barred.

Plaintiff argues that the "continuing violation" doctrine should apply, allowing redress for events occurring before the 300-day time frame.  (P's Opp. at 2-3.)  "The continuing violation doctrine states that when 'a plaintiff has experienced a continuous practice and policy of discrimination . . . commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  *Pattanayak v. Mastercard Inc.*, No. 21-CV-2657, 2022 WL 564047, at *3 (S.D.N.Y. Feb. 24, 2022) (quoting *Washington v. County at Rockland*, 373 F.3d 310, 317 (2d. Cir. 2004)).  But this doctrine does not apply to discrete employment actions, including "termination, failure to promote, denial of transfer, or refusal to hire," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002), and "the rejection of a proposed accommodation is a single completed action when taken" even if "the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed,'" *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) (emphasis in original) (cleaned up); *see O'Leary v. Town of Huntington*, No. 11-CV-3754, 2012 WL 3842567, at *8 (E.D.N.Y. Sept. 5, 2012) ("[A]n employee who continues working after the denial of a reasonable accommodation may not claim a continuing violation . . . .").

Plaintiff's discrimination, failure-to-accommodate, and retaliation claims are based on discrete acts, including placing her on leaves of absences, declining to schedule a meeting with upper management, giving her an "urgent" assignment a few days before scheduled surgery when she was just getting used to a new keyboard, and her eventual termination.  (P's 56.1 Stmt.

¶¶ 154-157, 161, 164-165.)  None of these constitute "acts of a continuing nature" and are not actionable under the "continuing violation" doctrine.  *See Anderson v. N.Y.C. Dep't of Finance*, No. 19-CV-7971, 2020 WL 1922624, at *3-4 (S.D.N.Y. Apr. 21, 2020) (cleaned up).

But the "continuing violations" doctrine must be analyzed separately in relation to Plaintiff's hostile work environment claim.  Hostile work environment claims are "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Morgan*, 536 U.S. at 117 (cleaned up).  If any one act contributing to the claim occurs within the applicable time frame, then the Court may consider acts that on their own would have been time barred, as long as at least one alleged act occurred within the prescribed time frame. *Id*.  But if the acts outside the relevant time frame are unrelated to the acts within the time frame, the employee cannot allege the prior acts as part of the same hostile work environment claim. *Id.* at 118.  Plaintiff's hostile work environment claim is predicated on allegations relating to transferring assignments for Sullivan County to other employees; initially telling Plaintiff (but then retracting) that attendance at a holiday party was mandatory; not initially providing Plaintiff with the chair she used at Sullivan County after her transfer to Ulster County; removing her original keyboard from her workstation after providing her with a left-handed keyboard; assigning Plaintiff an "urgent" assignment before surgery; placing another employee's personal effects in Plaintiff's workstation while she was out in 2017; and initially declining Plaintiff's request to be reassigned to Ulster County.  (P's 56.1 Stmt. ¶ 158; P's Depo. 191:12-205:21.) None of these acts occurred after February 20, 2018, given that Plaintiff was not working remotely or in-person, part-time or full time, after February 20, 2018.  All of the incidents alleged in relation to her hostile work environment claim occurred before the filing period, rendering the "continuing violations" doctrine inapplicable.

Therefore, Plaintiff's ADA hostile work environment claim is time-barred, and for her remaining ADA claims, any allegations arising prior to February 20, 2018 are time-barred.

### 2. NYSHRL and RA Claims

NYSHRL and RA claims for disability discrimination are subject to a three-year statute of limitations. *Hernandez v. City of N.Y.*, No. 11-CV-6644, 2015 WL 321830, at *25 (S.D.N.Y. 2015) (NYSHRL); *Martinez-Tolentino v. Buffalo State Coll.*, 715 N.Y.S.2d 554, 555 (App. Div. 2000) (NYSHRL); *O'Quinn v. City of N.Y.*, No. 19-CV-9663, 2021 WL 4429787, at *9 (S.D.N.Y. Sept. 27, 2021) (RA). "A continuing violation doctrine applies to NYSHRL claims and is coterminous with the scope of the continuing violation doctrine that applies to federal civil rights claims." *Cruz v. City of N.Y.*, No. 21-CV-1999, 2021 WL 5605139, at *5 (S.D.N.Y. Nov. 30, 2021); *see Harris v. City of N.Y.*, 186 F.3d 243, 248 (2d Cir. 1999) (applying the continuing violations doctrine to RA claims).

Plaintiff filed this action on August 22, 2019. (Compl.) Absent some basis for tolling the statute of limitations, her NYSHRL and RA claims based on discriminatory or retaliatory acts occurring before August 22, 2016 are time-barred. But "[t]he Second Circuit has not yet determined whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under the NYSHRL and NYCHRL." *Rogers v. Fashion Inst. of Tech.*, No. 14-CV-6420, 2017 WL 1078572, at *9 n.5 (S.D.N.Y. Mar. 21, 2017) (cleaned up). "Nevertheless, numerous courts in the Second Circuit have held that the filing of an EEOC charge does indeed toll the limitations period [for NYSHRL claims]." *Zagerson v. N.Y.C. Dep't Educ.*, No. 20-CV-11055, 2022 WL 292917, at *8 (S.D.N.Y. Jan. 31, 2022); *see Esposito v. Deutsche Bank AG*, No. 07-CV-6722, 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008) (collecting cases). Giving Plaintiff the benefit of that rule tolls Plaintiff's time for file for 158

days, as she filed her charge with the EEOC on December 17, 2018, (ECF No. 72-5 at 4), and the

EEOC issued its Notice of Right to Sue letter on May 24, 2019, (ECF No. 72-6 at 2).  Adding

this number to the original three-year limitations period, any NYSHRL claims arising before

March 17, 2016 are time barred.[14]

But filing a grievance with the EEOC does not toll the statute of limitations as to RA

claims.  *Solomon v. N.Y.C. Bd. of Educ.*, No. 95-CV-1878, 1996 WL 118541, at *4 (E.D.N.Y.

Mar. 6, 1996); *Pajak v. N.Y. State Off. of Temporary & Total Disability*, No. 16-CV-899, 2018

WL 4268915, at *6 n.3 (W.D.N.Y. Sept. 7, 2018).  Therefore, Plaintiff's RA claims based on

discriminatory or retaliatory acts occurring before August 22, 2016 are time barred.

## B.   <u>Discrimination Claims</u>

Plaintiff's disability discrimination claims under federal and state law[15] are analyzed

under the familiar burden-shifting framework established by the Supreme Court in *McDonnell*

---

[14] In its brief, Defendant states any acts prior to March 11, 2016 should be time barred after applying the tolling provision.  (D's Mem. at 4.)  But Defendant does not explain how it came up with this date.  In any event, the difference between March 11 and March 17, 2016 is immaterial.

[15] "Claims of employment discrimination under the [RA] – as well as claims brought under the NY[S]HRL – are generally analyzed under the same standards that govern employment-discrimination claims under the [ADA] . . . ."  *Williams v. MTA Bus Co.*, No. 17-CV-7686, 2020 WL 1922911, at *5 (S.D.N.Y. Apr. 20, 2020), *appeal filed*, No. 20-2985 (Sept. 2, 2020); *see Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) ("A claim of disability discrimination under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims.") (cleaned up).  The New York state legislature amended the NYSHRL, effective August 12, 2019, directing courts to construe the law "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws worded comparably to the provisions of [the NYSHRL], have been so construed."  N.Y. Exec. Law § 300.  The effect of the amendments is to make the standards for NYSHRL claims closer to the more liberal standards of the New York City Human Rights Law.  *Moore v. Am. Fed'n of State, Cnty. & Mun. Emps. Loc. 1095*, No. 17-CV-0704, 2022 WL 262347, at *10 n.13 (W.D.N.Y. Jan. 28, 2022), *report and recommendation adopted*, 2022 WL 1497959 (W.D.N.Y. May 12, 2022), *appeal filed*, No. 22-1123 (2d Cir. May 23, 2022).  But these amendments only apply to claims that accrued on or after October 11,

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Kovaco v. Rockbestos-Surprenant Cable*

*Corp.*, 834 F.3d 128, 136 (2d Cir. 2016); *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir.

2013); *Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 1809772, at *4 n.5 (S.D.N.Y.

Apr. 30, 2013).

> Under that framework, plaintiff must first establish a *prima facie* case of
> discrimination, which causes the burden of production to shift to the defendant to
> offer a legitimate, nondiscriminatory rationale for its actions.  If the defendant
> satisfies its burden of production, then the presumption raised by the *prima facie*
> case is rebutted and drops from the case, such that at the final stage, the plaintiff
> then has the opportunity to demonstrate that the proffered reason was not the true
> reason for the employment decision.

*Kovaco*, 834 F.3d at 136 (cleaned up).  In demonstrating that the employer's proffered reason

was not the true reason for the employment decision, a plaintiff "must produce not simply some

evidence, but sufficient evidence to support a rational finding that the legitimate, non-

discriminatory reasons proffered by the defendant were false, and that more likely than not

discrimination was the real reason for the employment action."  *Weinstoc k v. Colum. Univ.*, 224

F.3d 33, 42 (2d Cir. 2000) (cleaned up).  "In short, the question becomes whether the evidence,

taken as a whole, supports a sufficient rational inference of discrimination."  *Id.*  The plaintiff

must "prove that [disability] discrimination was the but-for cause of any adverse employment

action."  *Natofsky v. City of N.Y.*, 921 F.3d 337, 348 (2d Cir. 2019).

To establish a *prima facie* case of discrimination based on disability, a plaintiff must

show:  "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the

ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or

---

2019. *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4
(S.D.N.Y. Aug. 29, 2019).  Because Plaintiff's allegations are based on events from before this
date, the amendments do not apply retroactively to Plaintiff's claims here.

without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." *Cameron v. Cmty. Aid for Retarded Child., Inc*., 335 F.3d 60, 63 (2d Cir. 2003) (cleaned up).  For purposes of the instant motion, Defendant contests the third and fourth elements, arguing that Plaintiff cannot show that she was qualified for the CSRCC role or point to any adverse employment action that occurred because of her disability.  (D's Mem. at 5-15.)

### 1.    Whether Plaintiff Was Qualified for the CSRCC Role

Defendant argues that Plaintiff's termination did not violate the ADA or NYSHRL because she was not qualified for the CSRCC position, which she accepted at the end of February 2018 but never started.  (*Id.* at 5-12.)  Under the ADA, a person "is not otherwise qualified unless he is able, with or without reasonable accommodation, to perform the essential functions of the job in question." *Stamey v. NYP Holdings, Inc*., 358 F. Supp. 2d 317, 323 (S.D.N.Y. 2005); *see* 42 U.S.C. § 12111(8).  "This inquiry is made with respect to the individual's condition at the time of the alleged adverse employment action." *Silver v. Entergy Nuclear Operations, Inc.*, 290 F. Supp. 3d 234, 244 (S.D.N.Y. 2017).  "'Essential functions' are duties that are 'fundamental' to the job in question." *Vandenbroek v. PSEG Power, CT LLC*, 356 F. App'x 457, 459 (2d Cir. 2009) (summary order) (cleaned up).  "In determining which duties are fundamental, [courts] accord 'considerable deference to an employer's judgment.'" *Id*. (quoting *D'Amico v. City of N.Y*., 132 F.3d 145, 151 (2d Cir. 1998)).  But "a plaintiff can discharge their burden by demonstrating that they possess the basic skills necessary for the performance of the job." *Makinen v. City of N.Y*., 53 F. Supp. 3d 676, 693 (S.D.N.Y. 2014) (cleaned up).

The responsibilities of the CSRCC position include "answering incoming calls from the public, prospective Medicaid enrollees and people assisting Medicaid enrollees or acting on their

behalf; tracking and documenting all inquiries; facilitating the fulfillment of requests for materials via mail, email or download; transferring or referring callers to appropriate entities; and, escalating calls or issues as appropriate." (P's 56.1 Stmt. ¶ 91.) Critically, the position requires typing. (*Id.*)

Defendant argues that Plaintiff cannot establish she is a "qualified individual" under the ADA because in her September 13, 2018 application for SSDI benefits, which was submitted five days before her termination, (Herrera Decl. Ex. A-17), Plaintiff claimed she had been disabled since July 15, 2017, and was unable to type, (ECF No. 72-10 at 6-7; P's 56.1 Stmt. ¶ 143). Indeed, in her SSDI application, Plaintiff stated, "I did a lot of typing for my job. I cannot type without doing myself harm. I am in constant pain." (ECF No. 72-10 at 7.) In her testimony before the ALJ, Plaintiff said that "this pain prevented her from handling and holding items such as a coffee cup, typing, or handling small objects, or fastening clothing or shoes with her right dominant hand." (ECF No. 72-30 at 2.)[16] Plaintiff clearly stated that she cannot type without pain and harm, thereby claiming disability on the basis that she could not perform an essential function of the CSRCC position – typing. These statements are inconsistent with Plaintiff's claim here that following her latest request for leave on August 22, 2018, she intended to and was able to return to work.

The Supreme Court in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), held that a plaintiff may properly claim that she was totally disabled in one context and disabled but able to work with reasonable accommodation in another: "an ADA suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an

---

[16] This testimony occurred on December 10, 2019, (ECF No. 72-30 at 1), but Plaintiff was describing her condition from August 2017, when she had a second surgery, forward, (*see* ECF No. 72-30 at 2.)

SSDI claim that the plaintiff could not perform her own job (or other jobs) without it." *Id.* at 803 (emphasis omitted).  That is, under certain statutes – such as the ADA – the definition of disability takes into account "reasonable accommodations" that enable an individual to work, while others – such as SSDI – do not.  The distinction drawn by the Supreme Court has been applied in ADA cases in this Circuit.  *See Kovaco*, 834 F.3d at 137-38; *Tse v. N.Y. Univ.*, 190 F. Supp. 3d 366, 370 (S.D.N.Y. 2016); *Clough v. Westchester Med. Ctr.*, No. 04-CV-631, 2006 WL 8461802, at *7 (S.D.N.Y. May 19, 2006).

But the Supreme Court recognized that "in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim." *Cleveland*, 526 U.S. at 805.  "[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example 'unable to work' will appear to negate an essential element of her ADA case – at least if she does not offer a sufficient explanation." *Id.* at 806.  Thus when, as here, "a plaintiff's previous sworn statement [is] asserting 'total disability' or the like, the court should require an explanation of an apparent inconsistency with the necessary elements of an ADA claim." *Id.* at 807.  The plaintiff's "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.*; *see Kovaco*, 834 F.3d at 138-39.

In her opposition, Plaintiff states she made the statements in her benefits application "because at the time she was not cleared to return to work and because Defendant had not provided her with the promised ergonomic workstation and voice recognition software."  (P's Opp. at 7.)  She states, "In light of the timing of the benefits application – before Plaintiff had been cleared to return to work and before she had been given a chance to try out an ergonomic

workstation at home – a reasonable juror could conclude that Plaintiff could have been able to perform her job if offered the right reasonable accommodation." (*Id.*) Plaintiff's explanation makes clear, and confirms the statement in her SSDI benefits application, that she could not perform an essential function of her position – typing – without an accommodation. But she contends that she could perform the essential functions of her job with a reasonable accommodation – specifically, the promised ergonomic workstation and voice recognition software.

The first part of Plaintiff's claim is plainly incorrect. At the time of her disability benefits application, she had been medically cleared to return to work part-time as a CSRCC, (P's 56.1 Stmt. ¶¶ 88, 90), and had even been cleared to work full days during the training, (Herrera Decl. Ex. A-14). Further, Defendants are correct, (ECF No. 84 ("D's Reply") at 4), that it is undisputed that Defendant told Plaintiff that it would provide her with voice recognition software and ergonomic equipment to use at home. (P's 56.1 Stmt. ¶ 146.) And it is clear that "the only reason [Plaintiff] didn't have an ergonomic workstation was because [she] hadn't yet started working at home." (P's Depo at 271:11-272:3.) But it is seemingly disputed whether Plaintiff could have performed the essential functions of her job, mainly typing, with the assistance of the promised ergonomic workstation and voice recognition software, because she never had a chance to use them as she never started working from home. Plaintiff's proffered explanation is that because she had not yet *received* the promised ergonomic workstation and voice recognition software at the time she filed for SSDI benefits, a reasonable jury could find that she could type without doing herself harm and being in constant pain with the help of those items. In other words, she contends that had she received the workstation and software, she believes she could have been able to type and perform the other essential functions of the

CSRCC position.  *Cf. Kovaco*, 834 F.3d at 140 (plaintiff's SSDI statements were inconsistent because he did have access to the reasonable accommodation mentioned when he stated in his application that he was unable to work, "belying his explanation that he was only 'unable to work' because he lacked reasonable accommodation").[17]

I find it unlikely that a jury would agree, but I cannot say that the argument is so implausible as to permit estoppel.  Plaintiff manages to provide a sufficient explanation to address the inconsistencies here – that at the time she filed for benefits, she was in constant pain and could not type, but had she actually been provided the workstation and software, she could have performed the essential functions of her job.  This explanation is barely "sufficient to warrant a reasonable juror's concluding that . . . the plaintiff could nonetheless 'perform the essential functions' of her job, with . . . 'reasonable accommodation.'"  *Cleveland*, 526 U.S. at 807.

Defendant also argues that, even ignoring the statements made by Plaintiff in connection with her disability application, she admits that she could not physically perform the essential functions of the CSRCC when she was terminated.  (D's Mem. at 12.)  Defendant overstates Plaintiff's admission.  When asked, "As of September 18, 2018 could you physically perform the part-time call center representative role," Plaintiff said, "Based on the doctor's note, no."  (P's Depo. at 337:3-21.)  But neither the question nor the answer makes clear whether it is addressed to working with or without a reasonable accommodation.  Further, when asked, "[A]s of September 18, 2018 what, if any accommodation could Maximus have given you that would have allowed you to return to the part-time call center representative role?" Plaintiff answered, "I

_____

[17] That ALJ Lemoine found Plaintiff unable to perform past work also does not preclude her from taking the position that she could have performed the work with an accommodation. *See Kovaco*, 834 F.3d at 139.

don't know."  (*Id.* at 364:3-10.)  Defendant contends that Plaintiff's inability to identify *any*

accommodation that would have allowed her to perform the essential functions of her job as of

the day she was terminated shows that she was not qualified.  (D's Mem. at 12.)  This testimony

is indeed strong evidence that Plaintiff could not do the CSRCC job, period.  But the question is

not clear as to whether it referred to any accommodation beyond those Defendant had already

offered, or if it meant any accommodation at all.  Given the context of the deposition, Plaintiff

could have interpreted the question as referring to the former.  If so, she has identified a

reasonable accommodation – the use of the ergonomic workstation and voice recognition

software.  And as discussed above, while Defendant did grant this accommodation, Plaintiff was

never in position to use the workstation or software, so – although I believe Defendant has the

better of the argument – a fact issue remains as to whether she was able to perform the essential

functions of her job with a reasonable accommodation.

### 2.    Whether Plaintiff Was Subjected to an Adverse Action Due to Her Disability

Defendant also argues that Plaintiff has not provided evidence of any adverse

employment action imposed *because* of her disability.  (D's Mem. at 13-15.)  To carry her

burden on the fourth element of the *prima facie* case, Plaintiff "has a *de minimis* burden to

produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude

that her discharge occurred under circumstances giving rise to an inference of discrimination."

*Duprey v. Prudential Ins. Co.*, 910 F. Supp. 879, 885 (N.D.N.Y. 1996); *see Schwapp v. Town of

Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must

provide more than conclusory allegations of discrimination to defeat a motion for summary

judgment."); *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 252 (S.D.N.Y. 2015)

("The relevant question, therefore, is whether Plaintiff presented sufficient evidence that her

termination was 'because of' her disability to satisfy her 'minimal burden' of establishing a

*prima facie* case of discrimination under the McDonnell Douglas framework.")  Courts must

"carefully distinguish between evidence that allows for a reasonable inference of discrimination

and evidence that gives rise to mere speculation and conjecture."  *Bickerstaff v. Vassar Coll.*, 196

F.3d 435, 448 (2d Cir. 1999).

> For purposes of the *prima facie* case,
>
>> An inference of discrimination can arise from circumstances including, but
>> not limited to, the employer's criticism of the plaintiff's performance in . . .
>> degrading terms [relating to a protected characteristic]; or its invidious comments
>> about others in the employee's protected group; or the more favorable treatment
>> of employees not in the protected group; or the sequence of events leading to the
>> plaintiff's discharge. . . .
>
>> [A]n inference of discrimination also arises when an employer replaces a
>> terminated or demoted employee with an individual outside the employee's
>> protected class.

*Littlejohn v. City of N.Y.*, 795 F.3d 297, 312-13 (2d Cir. 2015) (cleaned up).  The record here

contains no circumstantial evidence (let alone direct evidence) suggesting that Defendant acted

with discriminatory intent.  Indeed, in her opposition Plaintiff fails to address any of Defendant's

arguments relating to this element.  *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (non-moving party "cannot defeat" a summary judgment motion "by relying on the

allegations in [its] pleading or on conclusory statements") (cleaned up).  There is no evidence of

any criticism of Plaintiff's performance (let alone in terms relating to her condition), invidious

comments, or favorable treatment toward others on the part of Defendant.[18]

---

[18] Nor can Plaintiff rely on any alleged temporal proximity between her injury and her
termination, given that she initially injured her right elbow in January 2015, underwent an initial
surgery on June 7, 2016, had a second surgery in August 2017, and was not terminated until
September 2018.  These gaps are too long to infer causation or discriminatory intent.  *Payne v.
Cornell Univ.*, No. 21-CV-109, 2022 WL 453441 at *3 (2d Cir. Feb. 15, 2022) (no inference of

The sequence of events leading up to Plaintiff's termination makes clear that Defendant bore no animus toward Plaintiff based on her disability.  In order to accommodate Plaintiff, Defendant granted her various leaves of absence to recover from her surgery and, upon learning about her limitations, identified a new position for Plaintiff.  (P's 56.1 Stmt. ¶ 90.)  Defendant then engaged in lengthy conversations, emails and texts with Plaintiff over a period of months to address her work-from-home needs and her questions relating to the new position and the telecommuter agreement.  (*Id.* ¶¶ 95, 101, 103-108, 112, 114-116; ECF No. 72-21; ECF No. 72-22; ECF No. 72-23.)  Only after Plaintiff did not appear for the mandatory training on three occasions did Defendant then terminate her one month later, after receiving a doctor's note stating that she could not work for the next six weeks, (ECF No. 72-29 at 3), because it could not further extend a leave that had already exceeded a year, (Herrera Decl. Ex. A-17).  This is not evidence of discrimination; if anything, it is the opposite.

Plaintiff appears to have fallen victim to the fallacy that because she was disabled, the adverse action of termination must have been discrimination based on her disability.  *See Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say:  "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (cleaned up), *aff'd*, 693 F. App'x 41 (2d Cir. 2017) (summary order).  "[T]he facts that [P]laintiff is disabled and that [Defendant] fired her [are] insufficient to raise [a]n inference of discrimination."  *Duprey*, 910 F. Supp. at 885; *see Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231,

---

but-for causation where decisions had valid business justifications and "record [was] clear that . . . the adverse employment actions . . . occurred well after the disclosure of [plaintiff's] disability").

235 (2d Cir. 2002) ("[Plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his [protected status].") (cleaned up).

Therefore, Plaintiff has not established a *prima facie* case for disability discrimination under the ADA/RA or NYSHRL.

### 3.   Whether Defendant Offers a Legitimate, Nondiscriminatory Reason for Its Actions

*Even if* Plaintiff had made out her *prima facie* case, Defendant offers a legitimate, nondiscriminatory reason for Plaintiff's termination actions:  "Awilda Martinez's decision that there was no accommodation MAXIMUS could offer that would allow Plaintiff to return to work, as it had already offered her three opportunities to attend the CSR – Call Center training, and she had refused to attend every one."  (D's Mem. at 15.).  The record supports Defendant's proffered reasoning.[19]

Defendant terminated Plaintiff after informing her that she had to attend this mandatory training, (P's 56.1 Stmt. ¶¶ 95, 97), and giving her three opportunities across four months to complete it, (ECF No. 72-22 at 3-4; ECF No. 72-23; ECF No. 72-24).  Further, Plaintiff declined to attend the first training only one day before, (ECF No. 72-22 at 5-6), and the second training three days before, (Herrera Decl. Ex. A-16).  Five days before the third training date, Plaintiff

---

[19] To the extent Plaintiff suggests that the delay between February and April in scheduling her training was an adverse action – and the Court does not see that she does, but Defendant has so construed her claim in an excess of caution, (D's Mem. at 13-14) – Defendant sets forth a legitimate reason for that delay:  "Herrera's belief that Plaintiff had not reached a final decision on whether to transfer positions," (*Id.* at 15).  The record supports this contention.  Despite Plaintiff stating in February 2018 that she accepted the CSRCC position, she did so conditionally, stating she needed to accumulate funds for the training commute.  (P's Depo. at 220:5-221:18.)  She then posed a series of questions about the job, the training and her equipment.  (Herrera Decl. Ex. A-13.)  Herrera's joyful reaction to Plaintiff's April statement that was ready to move forward, (*id.*), shows that Herrera did not, until that time, believe Plaintiff had committed to taking the job.

emailed Herrera, "In light of my upcoming appointment, I am unsure and at the interest of all parties, to move foward [*sic*] with the August 6th training date." (ECF No. 72-26.) For the first training, Plaintiff simply requested to postpone the training and when asked why, she simply said, "I requested to put the training on hold." (ECF No. 72-22 at 5-6.) For the second training, Plaintiff stated, "With additional items pending confirmation, I am unsure if I am able to meet your 4pm deadline [to confirm attendance]" and "I am regretfully unable to meet your 4 pm deadline today." (Herrera Decl. Ex. A-16.) And for the third training, she canceled "due to [her] appointment scheduled for 8/22/18." (ECF No. 72-28.) Given these last-minute and/or unjustified refusals to attend the training, it is little wonder that Defendant concluded that "[a]t this point, it does not appear that you are willing to resume duty at this time and, therefore, we have no other option but to consider that you are voluntarily resigning from your position." (ECF No. 72-27.) Even though Plaintiff responded that she was "not intend[ing] to appear as unwilling to resume duty or to voluntarily resign from [her] position," she added that she was "seeking the assistance of the EEOC," and gave no indication of any interest in rescheduling. (ECF No. 72-28.) Nine days later, on August 22, she submitted a doctor's note that she was not to work for six more weeks. (ECF No. 72-29.) The year of absence, months of postponements, and lack of assurance that Plaintiff would actually be returning created a legitimate, nondiscriminatory reason for Defendant's decision to terminate Plaintiff. "Many courts have found job abandonment and excessive absenteeism to be legitimate business reasons for termination." *Constance v. Pepsi Bottling Co. of NY*, No. 03-CV-5009, 2007 WL 2460688, at *24 (E.D.N.Y. Aug. 24, 2007) (collecting cases); *see Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 263 (E.D.N.Y. 2015) ("Federal courts do not have a roving commission to review business judgments, and may not sit as super personnel departments, assessing the merits – or

even the rationality – of employers' non-discriminatory business decisions.  Typically, it is not

for courts to second-guess the quality or wisdom of the reason, so long as it is not unlawfully

discriminatory.") (cleaned up).  Thus, Defendant has proffered a legitimate, nondiscriminatory

reason for Plaintiff's termination: her continued absence and the uncertainty of her returning to

her newly assigned position.

### 4. Whether Plaintiff Demonstrates that Defendant's Reason Is Pretextual

Because Defendant has met its burden by offering a legitimate, nondiscriminatory reason

for terminating Plaintiff, the burden shifts back to Plaintiff to produce evidence that Defendant's

reasoning is pretextual.  *See Sista v. CDC Ixis N. Am., Inc*, 445 F.3d 161, 169 (2d Cir. 2006).  A

plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational

finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and

that more likely than not discrimination was the real reason for the employment action."

*Weinstock*, 224 F.3d at 42 (cleaned up).  "In short, the question becomes whether the evidence,

taken as a whole, supports a sufficient rational inference of discrimination."  *Id*.  "[A] reason

cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was

false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 515 (1993) (emphasis in original) (cleaned up).  Here, Plaintiff fails to provide *any* evidence

demonstrating that Defendant's nondiscriminatory reason for terminating her was pretextual as

she does not address Defendant's proffered reason at all in her opposition.  Nor does the record

reveal any evidence of pretext.

Accordingly, Plaintiff's disability discrimination claims under the ADA, RA and NYSHRL are dismissed.[20]

### C.   **Failure to Accommodate**

Defendant construes some of Plaintiff's allegations as failure-to-accommodate claims – that is, by terminating Plaintiff instead of continuing her leave of absence, and by placing Plaintiff on unpaid leaves on October 3, 2016 and May 24, 2017 and denying her the "opportunity to work," Defendant failed to accommodate her disability.  (D's Mem. at 15-20.) Given the differing limitations periods applicable under the ADA and RA/NYSHRL, Plaintiff's allegation that Defendant failed to accommodate Plaintiff's disability by terminating her instead of continuing her leave of absence will be analyzed under all three statutes, and Plaintiff's allegation that she was denied the "opportunity to work" by being placed on leaves of absences in October 2016 and May 2017 will be analyzed only under the NYSHRL and RA.

---

[20] To the extent Plaintiff attempts to allege claims of discrimination based on other events – such as denial of her requests for a meeting with upper management; denial of work on Sullivan County projects and (initially) a transfer to Ulster County; being without a keyboard tray for a week; being asked to provide site coverage after her transfer to Ulster; being instructed (initially) to attend a holiday party; the temporary absence of her "original" keyboard and preferred ergonomic chair; being given "urgent" assignments; and a co-worker putting personal effects in Plaintiff's workspace while she was on leave, (P's 56.1 Stmt. ¶¶ 155, 158) – none of these are materially adverse employment actions because they were not "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (cleaned up) (materially adverse actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities") (cleaned up); *see Norris v. N.Y.C. Hous. Auth.*, No. 02-CV-6933, 2004 WL 1087600, at *17 (S.D.N.Y. May 14, 2004) (withholding office equipment is not an adverse change, but rather a mere inconvenience); *Kelly v. N. Shore-Long Island Health Sys.*, 166 F. Supp. 3d 274, 286 (S.D.N.Y. 2016) ("[R]eassignment to a position that is more inconvenient, or demotion that does not include a change in responsibilities, benefits, compensation, or prestige do not constitute material adverse employment actions."); *Castro v. City of N.Y.*, 24 F. Supp. 3d 250, 264 (E.D.N.Y. 2014) ("Although Plaintiff argues that other staff members were not required to [perform undesirable tasks], simply being assigned undesirable work duties is insufficient to establish adverse employment action . . . .") (cleaned up).

To make out a *prima facie* case of failure to accommodate, a plaintiff must establish that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (cleaned up). Defendant argues that Plaintiff's claim founders on the third and fourth elements. (D's Mem. at 16-17.)

The third element asks whether Plaintiff could have performed her essential job functions if provided reasonable accommodation for her disability. According to regulations promulgated under the ADA, as pertinent here, "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii) (2022). Where "the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (cleaned up). "Reasonable accommodation may take many forms, but it must be effective." *Id.* at 95. "At the same time, employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.*

### 1.    Plaintiff's Termination

Defendant primarily contests the third and fourth elements, arguing Plaintiff could not perform the essential functions of her job with a reasonable accommodation, and even if she could, it did not refuse a reasonable accommodation because a request for additional leave was

not reasonable.  I have already determined above that there is a fact issue as to whether Plaintiff could perform the essential functions of the CSRCC position with reasonable accommodations.  I will therefore focus on whether Plaintiff's August 22, 2018 request for an additional six weeks of leave can be considered a reasonable accommodation.

Defendant argues that affording Plaintiff yet another leave of absence would not have been reasonable, as Plaintiff did not establish that by receiving such an accommodation, she would be able to then return to work and perform the essential functions of her job.  (D's Mem. at 16-17.)  "The Second Circuit has held that a leave of absence for a finite period may be a reasonable accommodation if an employee shows that leave will enable him to perform the essential functions of the job when he return[s] to work."  *Manns v. United Airlines*, No. 13-CV-3668, 2016 WL 6826761, at *9 (E.D.N.Y. Nov. 17, 2016); *see Graves*, 457 F.3d at 186 n.6 (leave of absence may be reasonable accommodation where "finite" and "reasonably likely to enable the employee to return to work").  But "[w]hile temporary leave, for a specified period of time, with clear prospects for recovery, could be a reasonable accommodation, an indefinite leave of absence is not."  *Booker v. Soho Studio Corp.*, No. 17-CV-5426, 2020 WL 363912, at *5 (E.D.N.Y. Jan. 22, 2020) (cleaned up); *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("[T]he duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover . . . ."); *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 181-82 (2d Cir. 2016) (request for indefinite leave of absence is not reasonable accommodation under NYSHRL).  Plaintiff, as the employee, "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment."  *McBride*, 583 F.3d at 97.

Defendant argues that it had no assurance that a six-week leave of absence would have enabled Plaintiff to return to work.  (D's Mem. at 16-17.)  Plaintiff responds that the doctor's note from her August 22, 2018 medical appointment supported her request for an additional six weeks of leave, (P's Opp. at 6), but she does not confront the fact that all this doctor's note states is that "Deborah Deangelo was seen and evaluated in my office today.  She is to remain out of work for next 6 weeks."  (ECF No. 72-29.)[21]  Defendant points out correctly that this note fails to explain why Plaintiff required this leave and how it could plausibly result in her return to work. *See Hall v. Verizon N.Y., Inc.*, No. 13-CV-5518, 2017 WL 3605503, at *6 n.4 (S.D.N.Y. July 26, 2017) (employer "not required to be satisfied with . . . doctor's notes" that, like those here, lack "explanation, reasoning or basis") (cleaned up); *Bielski v. Green*, 674 F. Supp. 2d 414, 425-26 (W.D.N.Y. Dec. 11, 2009) (where plaintiff provided a doctor's note that "gave no explanation, reasoning or basis" for the requested accommodation, plaintiff failed to demonstrate a triable issue of fact) (collecting cases).

This note is the *only* evidence to which Plaintiff points as support for her request for more leave, demonstrating that Defendant at the time did indeed lack adequate assurances that Plaintiff would be able to return to work after this six-week leave and perform the essential functions of her job.  *See Graves*, 353 F. App'x 558, 560 (2d Cir. 2009) (summary order) ("[Leaves of absence] must enable the employee to perform the essential functions of his job.  Moreover, the employee must make a showing that the reasonable accommodation would allow him to do so at or around the time at which it is sought."); *Manns*, 2016 WL 6826761, at *9 ("[Plaintiff] has still

---

[21] This note came from a different doctor than the one who had written notes for Plaintiff since August 2017 and who on May 24, 2018 had cleared her to work full time for shadowing and part-time otherwise.  (*Compare* ECF No. 72-29, *with* Herrera Decl. Exs. A-8, A-9, A-10, A-11, A-14.)

failed to provide any medical evidence that [a fixed period of leave] would allow him to perform the essential functions of his position.  He has offered no medical testimony or reports to support his assertion that had he been given additional time off from work he would have been able to recover."); *Perkins v. U.S. Dep't of Treasury*, No. 18-CV-8911, 2022 WL 19772, at *13 (S.D.N.Y. Jan. 3, 2022) ("Plaintiff has failed to allege how taking sick leave would have enabled her to perform the essential functions of her job once she returned.").  Therefore, Plaintiff provided Defendant no "reasonable assurance that [she] could and would resume an essential function of her job on a date certain if given the accommodation of another leave of absence." *Hall*, 2017 WL 3605503, at *6.

Further, Plaintiff's request for a six-week leave starting August 22, 2018 came after she had already been away from work for over a year, starting August 15, 2017.  During this time, Defendant granted Plaintiff an initial leave of absence for her to undergo surgery, (P's 56.1 Stmt. ¶ 83), an extension until November 27, 2017, (*id.* ¶ 84), and a second extension after November 27, 2017 based on a doctor's note stating Plaintiff should "be out of work until further notice," (*id.* ¶ 85-86; Herrera Decl. Ex. A-10).  Plaintiff was cleared to work starting January 24, 2018 based on a doctor's note that stated she could return to work without physical restrictions but could only work 17.5 hours per week – later amended to 20 hours per week – until further notice. (Herrera Decl. Exs. A-11, A-12.)  Plaintiff remained out of work during early 2018 as Defendant worked to find suitable accommodations and alternative positions.  (P's 56.1 Stmt. ¶¶ 88, 90, 92, 95, 103.)  Once Defendant had identified the CSRCC position for Plaintiff in late January, (*id.* ¶ 90), and Defendant and Plaintiff engaged in lengthy, repetitive back-and-forth in which Defendant was unusually patient with Plaintiff's repeated purported concerns about issues as to which she had already been given assurances, (*see id.* ¶¶ 92, 94-96, 100-109, 112, 114-116, 121-

125, 127-129), Plaintiff refused to attend mandatory training three times between May 2018 and August 2018, (*see id.* ¶¶ 119, 129, 133), despite being cleared to return to work full time for that purpose, (Herrera Decl. Ex. A-14).

Where previous requests for leave do not result in the employee's return, the employer, without more, has no reason to believe that another leave would do the trick, and in those circumstances the latest request "amount[s] to a request for an indefinite leave, which is an unreasonable accommodation." *Hall*, 2017 WL 3605503, at *6. While Plaintiff here requested a specific period, the request followed previous requests that were granted, which already had extended her time away from work to beyond a year. *See Powers v. Polygram Holding, Inc*., 40 F. Supp. 2d 195, 201 (S.D.N.Y. 1999) (courts may conclude as a matter of law that an accommodation of "a very long leave of absence, such as one year," is unreasonable). By the time Plaintiff was terminated, she "was no longer working toward an accommodation of h[er] disability, but was effectively seeking an indefinite leave of absence. Such a leave simply cannot be a reasonable means of accommodation, and termination as a result of indefinitely continuing absence does not subject the employer to ADA liability." *Donofrio v. N.Y. Times*, No. 99-CV-1576, 2001 WL 1663314, at *7 (S.D.N.Y. Aug. 24, 2001).

In short, there is insufficient evidence for a reasonable jury to conclude that Plaintiff's request for a six-week leave – on the heels of a year of leave and months of procrastination – constituted a reasonable accommodation. *See Parker*, 204 F.3d at 338 ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work."); *McNamara v. Tourneau, Inc*., 496 F. Supp. 2d 366, 377 (S.D.N.Y.

2007) ("An employer cannot reasonably be expected to hold a job open for an employee without some indication that the employee is likely to return and some idea of when that is likely to happen."), *aff'd*, 326 F. App'x 68 (2d Cir. 2009) (summary order); *Forgione v. City of N.Y.*, No. 11-CV-5248, 2012 WL 4049832, at *9 (E.D.N.Y. Sept. 13, 2012) (reasonable leave request gives, among other things, indication that limitations necessitating leave would be resolved and that the employee would upon return be able to perform essential functions of job).

### 2.   Other Instances

Plaintiff in her opposition attempts to rely on new allegations relating to alleged failures to accommodate, which she never previously raised or alleged.  "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *11 (S.D.N.Y. Sept. 27, 2017) (cleaned up) (collecting cases).  This rule has been applied to *pro se* litigants.  *See Avillan v. Donahue,* 483 F. App'x 637, 639 (2d Cir. 2012) (summary order) ("The district court did not err in disregarding allegations [the pro se plaintiff] raised for the first time in response to [the defendant's] summary judgment motion."); *Wright v. Jewish Child Care Ass'n of N.Y.*, 68 F. Supp. 3d 520, 529 (S.D.N.Y. 2014) (*pro se* plaintiffs are not permitted to assert new claims in opposition to a motion for summary judgment); *Harvey v. N.Y.C. Police Dep't*, No. 93-CV-7563, 1997 WL 292112, at *2 n.2 (S.D.N.Y. June 3, 1997) (disregarding claims that a *pro se* plaintiff asserted for the first time in opposition to a motion for summary judgment).  But in an excess of caution, I will address Plaintiff's new allegations here.

Plaintiff argues that "it is not clear that Defendant was justified in taking the position that it would have been unreasonable to expect them to allow her to work at her original position in a part time capacity."  (P's Opp. at 4.)  I interpret this as a roundabout way of suggesting that

Defendant should have allowed Plaintiff to work part-time as a CSRO.  But Defendant was justified in not doing so, as it is undisputed that at the time, MAXIMUS did not employ part-time CSROs, nor did it have such a position available.  (P's 56.1 Stmt. ¶ 90.)  "[T]he ADA does not require an employer to create a new position or to eliminate an essential function of a job, as these are not considered *reasonable* accommodations."  *Clark v. Coca-Cola Beverages Ne., Inc.*, No. 20-CV-4040, 2022 WL 92060, at *3 (2d Cir. Jan. 10, 2022) (emphasis in original); *see Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 126 (2d Cir. 2019) (summary order) (reassignment to vacant position is reasonable accommodation, but ADA does not require employers to create entirely new positions, and employee's burden to show that reasonable accommodation exists includes existence of vacant position for which she is qualified); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) (employer need not reassign employee if no position is vacant, nor is employer obliged to create new position to accommodate employee); *Parnahay v. United Parcel Serv., Inc*., 20 F. App'x 53, 56 (2d Cir. 2001) (summary order) (affirming grant of summary judgment where plaintiff offered no evidence that alternative position for which he was qualified existed and was available).

Plaintiff also suggests that she had "valid reasons" for rejecting Defendant's offered accommodations and that Defendant failed to accommodate by not addressing the "legitimate problem[s]" she raised.  (P's Opp. at 4-6.)  Specifically, Plaintiff suggests that Defendant failed to accommodate her disability by never delivering the ergonomic keyboard and chair, left-handed keyboard, and voice recognition software to her home, even though it had agreed to do so.  (*Id.* at 5; *see* ECF No. 72-21 (Defendant agreeing in writing to provide to Plaintiff's home the same equipment "previously provided in connection with accommodations").)  This argument is absurd, as Plaintiff never even undertook the preliminary training that would have

allowed her to begin working at home as a CSRCC.  It is wholly unreasonable to impose ADA liability on an employer for not providing promised accommodations when the employee refuses to start the position.

Next Plaintiff states that Defendant, before the May training, refused to address her concerns about the telecommuter agreement, and particularly her concern that if the system went down, she would have to report to work in New York City.  (P's Opp. at 5.)  This claim is untrue, evidenced by the e-mails from Herrera to Plaintiff at 12:27 am on May 14 in which Plaintiff was assured that in the event of an outage she would "paid for the time while Systems is working on the problem," and "[i]f Systems is not able to resolve the problem immediately," she would "given the distance," be permitted to choose between reporting to the city or taking time off. (ECF No. 72-22.)  That Plaintiff did not like those choices hardly makes them unreasonable. "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee."  *Noll*, 787 F.3d at 95.

Plaintiff further argues that she did not attend the June training because Defendant had not addressed her concerns regarding cell phone connectivity.  (P's Opp. at 5-6.)  This is again untrue, as Plaintiff had been assured repeatedly, as early as May 14, that spotty cell service was not a problem.  (ECF No. 72-22.)  Further, she provides no explanation for why she could not have commenced the training even if that issue in fact had not yet been addressed.  She next claims that she refused the August 6, 2018 training because if it had gone beyond two weeks, she might have missed her August 22 medical appointment.  (P's Opp. at 6.)  There is no indication that that appointment would not have been accommodated had Plaintiff's progress at the training necessitated third week.  Further, when Plaintiff was advised on July 26 that she had to commit to the August 6 training by August 1, (ECF No. 72-24), and she responded that she could not do

so because of an August 22 appointment, she did not ask if she could be excused from the training to go to the appointment if necessary,[22] but rather said she would be contacting the EEOC, (ECF No. 72-26), effectively shutting down the conversation. Defendant was entirely justified in concluding that Plaintiff's alleged "valid reasons" for refusing the training were not in fact valid but were excuses to put off a return to work. During months of communicating with Plaintiff, Herrera continuously worked to provide her with as much information as possible, and gave her opportunities to share her thoughts and ask for more information. (*See, e.g.*, ECF No. 72-22 at 2 ("Please confirm if the responses below answer your questions and whether you are ready to move forward."); 4; ("If you have any further questions or concerns, I am glad to answer them."); 8 ("Let me know if you need any further information on this.")). Many employers would have become frustrated with Plaintiff's repetitious and irrelevant inquiries long before Defendant. Even if Plaintiff had "valid reasons" for declining the proposed accommodations, that does not mean that the accommodations were not reasonable or that Defendant violated the ADA in offering them. But the invalidity of Plaintiff's reasons further supports the conclusion that the accommodations were reasonable.

### 3.    Plaintiff's October 2016 and May 2017 Leaves of Absences

To the extent Plaintiff alleges Defendant denied her the opportunity to work by placing her on leaves of absences in October 2016 and May 2017, her failure-to-accommodate claim – which is time-barred under the ADA but timely under the NYSHRL and RA – also fails. Plaintiff appears to argue that instead of providing her with leaves of absences, Defendant should

---

[22] Such an inquiry would be particularly appropriate, had Plaintiff really wanted to work, given that the training and the August 22, 2018 doctor's appointment were both in Manhattan. (*See* ECF No. 72-29 (appointment at Hospital for Special Surgery on East 72nd Street); P's Depo. at 212:6-9 (training at 30 Broad Street).)

have provided her with a part-time schedule or another accommodation where she could have kept working as a CSRO, and thus failed to accommodate her.

Based on Plaintiff's doctor's notes, Plaintiff was unable to perform the essential functions of the CSRO position without an accommodation. According to its job description, the CSRO position required computer literacy and proficiency in Microsoft Excel and Word. (P's 56.1 Stmt. ¶ 18; *see* ECF No. 72-9.) Further, the role required using a computer keyboard at least a third and possibly two-thirds or more of the workday. (P's 56.1 Stmt. ¶¶ 20-21.) Additionally, a CSRO was not permitted to work from home and had to be present at the office during regular business hours. (*Id.* ¶¶ 24-25.)

In October 2016, Plaintiff submitted a doctor's note that stated, "Light duty with no significant use of right upper extremity. If unavailable, then out of work until further notice." (Herrera Decl. Ex. A-6.) Given that Plaintiff is right-handed, (P's 56.1 Stmt. ¶ 44), and typing was an essential function, Defendant reasonably believed, in light of the above restrictions outlined by her doctor, that there was no way she could perform the necessary functions of the CSRO position, so it provided her with a leave of absence. (Herrera Decl. ¶ 20.). Similarly, in May 2017, Plaintiff provided a doctor's note that said, "No repetitive stress to right upper extremity. NO lifting. Suggest supervisory or advisory until reassessed at next appointment on 6/28/17." (Herrera Decl. Ex. A-8.) Defendant therefore again provided Plaintiff with a leave of absence. (*Id.* ¶ 34.)

That Plaintiff wanted other accommodations instead – such as a part-time schedule – does not mean that Defendant failed to provide a reasonable accommodation. As explained in section III.C.2 above, Defendant was under no obligation to create a part-time CSRO position. Leaves of absences are considered reasonable accommodations under the ADA where the leave

would "likely enable an employee to return to work." *See Wenc v. New London Bd. of Educ.*, No. 14-CV-840, 2016 WL 4410061, at *13 (D. Conn. Aug. 16, 2016) (collecting cases). The first doctor's note explicitly states Plaintiff should be out of work if "light duty" is unavailable. And the second imposed restrictions that would have made it impossible for Plaintiff to perform the essential functions of her job. Under such circumstances, leaves of absence are a reasonable accommodation. *See id.* at *14 (collecting cases); 29 C.F.R. § 1630 app. (2022) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.") Thus where, as here, an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable." *Noll*, 787 F.3d at 94 (cleaned up). Because the leaves of absences here are "plainly reasonable," "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Id.* (cleaned up).

Therefore, Plaintiff fails to establish a *prima facie* failure-to-accommodate claim and summary judgment is granted as to that claim.[23]

---

[23] If Plaintiff intends to suggest that Defendant failed to engage in the required interactive process to explore accommodations, (*see* P's Opp. at 4), that contention would be frivolous. Even if failure to engage in the interactive process were itself a violation of the ADA, which it is not, *McBride*, 583 F.3d at 101-02; *Noll*, 787 F.3d at 98, the record here shows that Defendant, over a period of years, patiently, courteously, and creatively interacted with Plaintiff to give her every opportunity to keep her job. In October 2016, Herrera informed Plaintiff that she was working with Travelers and Plaintiff's doctor to find ways to have Plaintiff back at work with appropriate accommodations and/or restrictions. (ECF No. 72-15.) Herrera also met with Plaintiff on October 31, 2016. (P's 56.1 Stmt. ¶ 48.) Between November 2016 and April 2017, Defendant worked with Plaintiff on providing her with ergonomic equipment and ensuring that she would not have to cover other offices unless her needs could be met. (ECF No. 72-17; ECF No. 72-18; ECF No. 72-19.) In May 2017, Herrera and Cortez spoke with Plaintiff on the phone

D.     **Hostile Work Environment**

Plaintiff alleges that various incidents at her workplace created a hostile work

environment.  This claim can only be analyzed under the NYSHRL and the RA, not the ADA, as

all of the incidents on which she relies occurred before February 20, 2018, and the continuing

violation doctrine does not apply.

"The standard for demonstrating a hostile work environment is the same under Title VII,

the ADA, the Rehabilitation Act, and the NYSHRL."  *Zabar v. N.Y.C. Dep't of Educ.*, No. 18-

CV-6657, 2020 WL 2423450, at *6 n.7 (cleaned up).

> A *prima facie* hostile work environment claim under NYSHRL requires that the
> complained of conduct "(1) be objectively severe or pervasive – that is, creates an
> environment that a reasonable person would find hostile or abusive; (2) creates an
> environment that the plaintiff subjectively perceives as hostile or abusive; and (3)
> creates such an environment because of the plaintiff's protected status."

*Kugel v. Queens Nassau Nursing Home Inc.*, 568 F. Supp. 3d 253, 262-63 (E.D.N.Y. 2021)

(quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (*per curiam*)); *see Bilitch v. N.Y.C.*

*Health & Hosp. Corp*., 148 N.Y.S.3d 238, 245 (App. Div. 2021) (under the NYSHRL, "[a]

plaintiff . . .  must show that the workplace is permeated with discriminatory intimidation,

---

and Herrera suggested Plaintiff use a left-handed keyboard so she could return to work.  (P's
56.1 Stmt. ¶ 74.)  Plaintiff was able to return to work, after being cleared by her doctor to use this
kind of keyboard.  (ECF No. 72-20.)  After Plaintiff was limited to part-time work, Defendant
identified a position and made herculean efforts to get Plaintiff the necessary training.  (ECF No.
72-21; ECF No. 72-22; ECF No. 72-23; ECF No. 72-24.)  These efforts clearly show Defendant
engaged in the interactive process.  *See Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 420
(S.D.N.Y. 2014) ("An interactive process may involve a meeting with the employee who
requests an accommodation, requesting information about the condition and what limitations the
employee has, asking the employee what he or she specifically wants, showing some sign of
having considered the employee's request, and offering and discussing available alternatives
when the request is too burdensome.") (cleaned up).  Further, the interactive process is not even
required "when the end it is designed to serve – reasonable accommodation – has already been
achieved," such as here, "when the accommodations provided to the employee were plainly
reasonable."  *Noll*, 787 F.3d at 98.

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment").  To be sufficiently pervasive, the conduct "must be more than episodic; it must be sufficiently continuous and concerted." *Kugel*, 568 F. Supp. 3d at 253 (cleaned up).  In determining whether a hostile work environment existed, "a court must consider all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the plaintiff's work performance." *Bilitch*, 148 N.Y.S.3d at 245.  "The allegedly abusive conduct must not only have altered the conditions of employment of the employee, who subjectively viewed the actions as abusive, but the actions must have created an objectively hostile or abusive environment – one that a reasonable person would find to be so." *Clarke v. Metro. Transp. Auth.*, 57 N.Y.S.3d 491, 493 (App. Div. 2017) (cleaned up).

Plaintiff alleges that Defendant created a hostile work environment by (1) transferring assignments for Sullivan County to other employees; (2) telling Plaintiff to attend a holiday party despite her request not to (an instruction promptly withdrawn, (P's Depo. at 194:11-195:2)); (3) not initially providing her with the chair she had used at Sullivan County after she was transferred to Ulster County; (4) removing her original keyboard from her workstation after providing her with a left-handed keyboard; (5) giving her an assignment shortly before she was supposed to go on leave for surgery; (6) permitting another employee's personal items to be placed at Plaintiff's workstation when she was out on leave in 2017; and (7) initially declining her request to be reassigned to Ulster County.  (P's 56.1 Stmt. ¶ 158.)  But these incidents – taken together – do not rise to the level of seriousness or pervasiveness necessary for a hostile work environment claim.

The events of which Plaintiff complains are isolated and occasional, not pervasive.

"Isolated incidents generally will not suffice to establish a hostile work environment unless they

are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010); *see*

*Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents

must be repeated and continuous; isolated acts or occasional episodes will not merit relief.");

*Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) ("The incidents must be more

than episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive."). Nor do her allegations rise to the level of "severe." Several were promptly

remedied, and all were no more than "petty office grievances." *Paul v. Postgraduate Ctr. for

Mental Health*, 97 F. Supp. 3d 141, 183 (E.D.N.Y. 2015) (collecting cases). They do not "rise

above the level of petty slights and trivial inconveniences," *Marseille v. Mount Sinai Health Sys.,

Inc.*, No. 18-CV-12136, 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021), and thus "do not

rise to the level of a hostile work environment," *Pezzano v. Sears, Roebuck & Co.*, 131 F.3d 131

(table), 1997 WL 738071, at *3 (2d Cir. 1997). Indeed, far more distressing circumstances have

been found insufficient to constitute a hostile work environment. *See, e.g.*, *Abalola v. St. Luke's-

Roosevelt Hosp. Ctr.*, No. 20-CV-6199, 2022 WL 973861, at *10-11 (S.D.N.Y. Mar. 30, 2022);

*Postell v. Rochester City Sch. Dist.*, 136 F. Supp. 3d 492, 502-03 (W.D.N.Y. 2015). In short, the

incidents "were too few, too separate in time, and too mild, under the standard so far delineated

by the case law, to create an abusive working environment." *Alfano v. Costello*, 294 F.3d 365,

380 (2d Cir. 2002).

Moreover, "mistreatment at work . . . through subjection to a hostile environment . . . is

actionable . . . only when it occurs because of an employee's . . . protected characteristic."

*Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Here there is no evidence that would

"support any inference that a hostile work environment was created and existed because of [Plaintiff's] protected status." *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 498 (E.D.N.Y. 2019) (cleaned up). "[A]bsent some evidence to link Defendants' conduct to Plaintiff's protected characteristics, Plaintiff has not raised a triable question of fact on her hostile work environment claim." *Marseille*, 2021 WL 3475620, at *11.

Accordingly, Plaintiff's hostile work environment claims under the NYSHRL and RA are dismissed.

### E.    Retaliation Claim

Plaintiff alleges Defendant retaliated against her because she filed workers' compensation claims and reported an "incident with Joe Todora," the Commissioner of the Sullivan County Department of Social Services.  (P's 56.1 Stmt. ¶¶ 164, 166.)  "Retaliation claims under the Rehabilitation Act, ADA, and NYSHRL are governed by the same standards."  *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020).  To establish a *prima facie* case of retaliation, an employee must show that (1) the employee "was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).[24]

Plaintiff filed several workers' compensation claims during her time at MAXIMUS, including in December 2011, March 2012, January 2015, and September 2016.  (P's Depo. at

---

[24] Plaintiff's opposition, as it appears on the docket, includes a blank page after the heading "IV.  There Are Material Issues of Fact Concerning Plaintiff's Retaliation Claim."  (P's Opp. at 7.)  This is the same version that was sent to the *Pro Se* Intake office, and it appears the copy to which Defendant refers in its reply also had no content following the heading.  (*See* D's Reply at 9 ("[Plaintiff] ignores her retaliation and non-termination-related discrimination claims.").)

47:22-48:10).  Plaintiff claims she reported the Todora incident to Cortez in October 2016.  (*Id.* at 280:4-7.)  Thus, Plaintiff's retaliation claims can be analyzed only under the NYSHRL and the RA, not the ADA, as all the relevant events occurred before February 20, 2018.  And given the three-year statute of limitations of the NYSHRL and RA, the Court can only consider Plaintiff's September 2016 workers' compensation filing and her October 2016 complaint to Cortez.

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 187 (S.D.N.Y. 2020) (emphasis omitted) (cleaned up).  An employee's "complaint must be sufficiently pointed to be reasonably understood as a complaint of discrimination."  *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013) (cleaned up), *aff'd*, 597 F. App'x 19 (2d Cir. 2015) (summary order); *see Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015) (summary order) (plaintiff "must allege that [her employer was] on notice that [her] complaints were about [statutorily prohibited] discrimination, not just general unsatisfactory or unfair conduct").

Defendant argues – and the Court agrees – that Plaintiff did not engage in "protected activity."  She does not allege that Defendant retaliated against her because she opposed purported discrimination; instead, Plaintiff claims that Defendant retaliated against her for filing workers' compensation claims and for reporting an incident she had with a supervisor employed by Sullivan County.  (P's Depo. at 279:21-280:10, 335:10-25; P's 56.1 Stmt. ¶ 164.)  Filing a workers' compensation claim does not constitute a protected activity under the NYSHRL.  *See Dipinto v. Westchester County*, No. 18-CV-793, 2020 WL 6135902, at *7 (S.D.N.Y. Oct. 19, 2020); *Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 508 (S.D.N.Y. 2013); *D'Amico v. City of N.Y.*, 73 N.Y.S.3d 540, 558-59 (App. Div. 2018).

Nor is Plaintiff's report to Cortez about the incident with Todora[25] a protected activity. The record contains no evidence of the content of the report, beyond Plaintiff's inscrutable testimony that she had shared with Cortez an unidentified concern about the Commissioner – Cortez "had pushed – she was concerned, so she had pushed me to give her a reason why I was concerned.  And I had told her about an incident, and then she had requested the meeting."  (*Id.* at 147:6-12.)[26]

Plaintiff's "report" fails to qualify as a protected activity because there is no evidence that it contained mention of discrimination based on a protected characteristic.  At most, Plaintiff describes a strange incident that would not make an employer aware that the employee was complaining of discriminatory misconduct.  *See Brown v. City of N.Y.*, No. 11-CV-2915, 2013 WL 3789091, at *15 (S.D.N.Y. July 19, 2013) (no Title VII retaliation claim based on gender discrimination because plaintiff's purported protected activity "merely chronicles [an employee's] bizarre and discordant behavior in the workplace, while making at best glancing references to any gender-focus on that behavior").  Although Plaintiff may have felt uneasy after her interaction with Todora, she does not supply evidence of anything she reported that is

---

[25] Plaintiff testified:

> I was in my office, and [Todora] had come upstairs through the stairwell, was looking directly at me, came into the office.  Another county employee was in there.  We had been talking about the Beshrew Camp (phonetic) coming to invite me to their holiday gathering.  I did get up to shake his hand and I introduced myself.  I advised him that my name was Debbie DeAngelo and that I work for Maximus.  And when I shook his hand, he pulled my arm forward, and he advised me that he knew exactly who I was.

(P's Depo. at 149:20-150:12.)

[26] If the meeting to which Plaintiff refers is the October 31, 2016 meeting she had with Cortez, Herrera, and Michelle McFarlane, typed notes from that meeting do not include any mention of this incident or Plaintiff's report of it.  (ECF No. 83-1 at 33.)

"sufficiently pointed to be reasonably understood as a complaint of discrimination."

*Goonewardena*, 2013 WL 1211496, at *9; *see id.* at *9-10 (no retaliation claim where plaintiff's

"protected activity" had no "language that could reasonably be understood to be a complaint of

discrimination on disability"); *Cornetta*, 434 F. Supp. 3d at 188 (no retaliation claim under the

ADA and NYSHRL where plaintiff's "protected activity" did not contain any complaints of

informal or formal disability discrimination); *Villar v. City of N.Y.*, 135 F.Supp.3d 105, 134 n.11

(S.D.N.Y. 2015) ("[W]hile complaints about conduct clearly prohibited by the statute need not

mention discrimination or use particular language, ambiguous complaints that do not make the

employer aware of alleged discriminatory misconduct do not constitute protected activity.")

(cleaned up).

Even if Plaintiff's "report" to Cortez was a protected activity, Plaintiff fails to

demonstrate there was a causal connection between the protected activity and any materially

adverse employment action.  Plaintiff claims that following this report to Cortez, "it just seemed

as though e-mails weren't being responded to with regards to work.  My assignments that I had

done for – even though we were no longer at Sullivan County, those assignments were never

assigned to me.  They were assigned to other employees."  (P's Depo. at 192:2-13.)  The

reassignment of work to other employees is not a sufficient adverse employment action.  For a

retaliation claim, "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Kessler v.*

*Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006).  Examples include

reassignment to arduous tasks, punitive scheduling, loss of supervisory authority and false

disciplinary reports. *See Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *12 (S.D.N.Y. Aug. 11, 2016).

Plaintiff fails to demonstrate that the redistribution of Sullivan County work was anything more than (at most) a mere alteration of job responsibilities that would not have dissuaded a reasonable worker from making or supporting a charge of discrimination. Plaintiff states that "assignments were taken from [her] and reassigned to other staff with no explanation," and she knew about this "[b]ecause it was a general email, and [she] was included in this e-mail, and I was only assigned to Ulster County or maybe other counties." (P's Depo. at 193:10-21; 194:3-8.) She does not explain why doing work for Sullivan County was any more desirable than doing work for Ulster County. While Plaintiff may not have received the assignment she desired or the one she previously had, there is no indication or allegation that she was given significantly diminished responsibilities. *See Greco v. County of Nassau*, 146 F. Supp. 2d 232, 245 (E.D.N.Y. 2001) ("[A] mere undesired lateral move, standing alone, would to be sufficient to constitute adverse employment action . . . .") The reassignment of Sullivan County assignments to other employees after her October 2016 report to Cortez simply does not constitute an adverse employment action. *See Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003) ("Notably, retaliation laws are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled.") (cleaned up). Nor is there any indication that the reassignments were the result of the October 2016 report, as opposed to the closure of the Sullivan County office while Plaintiff was on leave and her subsequent assignment to Orange County and then Ulster County. *See Mendez-Nouel v. Gucci Am., Inc.*, No. 10-CV-3388, 2012 WL 5451189, at *13 (S.D.N.Y. Nov. 8, 2012) (inference of

causation arising from temporal proximity "may be negated – or, put differently, the causal chain

broken – where an intervening event post-dating the protected conduct provides an independent

basis for the adverse action, or where the uncontroverted evidence otherwise renders the

inference unreasonable in the case at hand"), *aff'd*, 542 F. App'x 12 (2d Cir. 2013) (summary

order).

Likewise, Plaintiff's belief that "it just seemed as though e-mails weren't being

responded to with regards to work" hardly rises to the level of a materially adverse employment

action.  Plaintiff never explains what exactly she means by this or provides evidence of any e-

mails that were not responded to at any point.  Nor is there any evidence, or even allegation, that

any supposed lack of response affected Plaintiff's ability to do her job or otherwise would be

serious enough to discourage a reasonable worker from making or supporting a charge of

discrimination.  *Cf. Graham*, 2018 WL 1318988, at *5 ("cutting off communication for days at a

time" does not constitute an adverse employment action under the ADA).

While Plaintiff's ultimate termination is an adverse employment action, there is no causal

connection between her report to Cortez and her termination.  Almost two years elapsed between

those events, and there are no other facts suggesting a causal connection between Plaintiff's

report and ultimate termination.  *See Brown*, 2013 WL 3789091, at *17 (no causal connection

and no temporal nexus found when there was a six-month period between plaintiff's protected

activity and the adverse employment action).

Therefore, Plaintiff's retaliation claims are dismissed.

**IV.**      **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 71), enter

judgment for Defendant, and close the case.

**SO ORDERED.**

Dated:  August 2, 2022
          White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.